460 NEBRASKA REPORTS. · [Vol. 29

State, ex rel. Bd. of Education, v. Benton.

STATE, EX REL. BOARD OF EDUCATION OF OMAHA, V. THOMAS H. BENTON.

[FILED MAY 6, 1890.]

1. **Schools**: BOND PROPOSITION: VOTE REQUIRED. The board of education of the city of O. submitted at a regular city election a proposition to issue bonds under the provisions of the act entitled "An act relative to public schools in metropolitan cities," approved March 31, 1887, at which election there were cast for the office of mayor 12,337 votes; for the proposition to issue school bonds, 4,930, and against the proposition, 2,992 votes. Bonds issued in pursuance of the proposition and authority were presented to the auditor of state for registration, and, upon rejection and application for *mandamus* to the officer, *held*, that the issuance of bonds was not sanctioned by the vote given.

2. ———: ———: PROVISION FOR INTEREST UNNECESSARY. Where a proposition to issue bonds is submitted by the board of education under the provisions of the act of March 31, 1887, *held*, that it was unnecessary that it be accompanied by a provision to levy a tax to pay the interest on such bonds.

3. ———: ———: FUNDS: APPROPRIATION. Under the provisions of the act of February 7, 1871, authorizing the board of regents of the high school, on Capitol square of the city of Omaha, to issue bonds, and of the acts amendatory and supplemental thereto, *held*, that the board of education of the school district of Omaha, under the authority and sanction of the electors, in accordance with the statute, may expend the public money, from the sale of school bonds, or otherwise, in the erection of school buildings on said square.

ORIGINAL application for *mandamus*.

*Lee S. Estelle,* and *Wm. E. Healey,* for relator, cited: *Gillespie v. Palmer,* 20 Wis., 572; *Walker v. Oswald,* 11 Atl. Rep. [Md.], 711; *State, ex rel. Stevenson, v. Babcock,* 17 Neb., 195.

*Wm. Leese, Attorney General (Charles. H. Brown* also filed a brief), *contra,* cited: *State, ex rel. O., etc. Co., v.*

*Bechel,* 22 Neb., 158; *State, ex rel. Stevenson, v. Babcock, supra; State, ex rel. Fremont, v. Babcock,* 25 Neb., 500.

COBB, CH. J.

The school district of the city of Omaha, as relator, in the name of the state, applied for a peremptory writ of *mandamus* against the auditor of public accounts, compelling him to accept the statement and register the bonds of the relator, issued for public uses, in the amount of $215,000, under the laws of this state.

The relator represents that the city of Omaha, on March 16, 1889, was a duly incorporated metropolitan city of 80,000 inhabitants, constituting one school district; that since November 1, 1889, it has had a board of education of fifteen members, duly elected and qualified as such; that at a regular meeting of the board November 11, 1889, there were present ten members, taking part in all matters acted upon, and by their affirmative vote consented and ordered that a proposition be submitted to a vote of the electors of the city for authority to issue bonds in the sum of $215,000, 215 in number of the denomination of $1,000 each, dated January 1, 1890, to bear interest at five per cent per annum, payable semi-annually, the principal to become due in twenty years from date and payable with the interest at the Nebraska fiscal agency in New York city, the proceeds of said bonds to be used for the purchase of school sites and the erection of school buildings to be used for school purposes in said school district, designating the locality of the sites, the amount of money required, and the cost of the school buildings; that the proposition be submitted at the time and places of holding the next city election thereafter, notice thereof to be given ten days before the election in one or more daily newspapers published within the city; that said notice was so published and said proclamation was so issued, and said election was held in

the manner and form prescribed by law, and the returns thereof made by the regular election board of said city and canvassed by said board of education; that the majority of the ballots polled at the election were in favor of the proposition and were returned and canvassed in the manner and within the time prescribed by law, showing that the proposition was duly carried and adopted by the city.   In pursuance of which the board of education prepared said bonds, which, on the face of each, expressed the fact that they were issued under the provisions of subdivision 17 of chapter 79 of the Compiled Statutes of Nebraska, 1889, were signed by the president and secretary of the board, specifying the rate of interest, and the time and place of payment of both principal and interest; each bond was for the sum of $1,000.

That subsequently, before this application, the relator submitted to the auditor of public accounts a written statement of the proceedings had and set forth, with a full statement of the assessed valuation of, and the number of children of school age residing in, said district, and the total bonded indebtedness thereof, which statement was certified under oath by the members of said board of education, and therewith submitted the bonds, so prepared, and requested the auditor to record the statement and register the bonds, which he refused and still refuses to do; that said statement showed that the aggregate school tax of said district did not exceed two per cent upon all taxable property of the district in the year 1888, or 1889, or 1890.

The relator therefore prays that the auditor be compelled to record the statement and register the bonds in his office, and that a peremptory writ of *mandamus* be issued to carry the order of the court to that end into effect.

Attached to the information of the relator was the statement submitted to the auditor and a stipulation by the relator, and by the attorney general on the part of the respondent, that:

I. The history of the bonds as presented to the auditor is to be attached to relator's petition as a part thereof.

II. The title to the site on which the high school building is situate, and for which the $75,000 contained in the proposition, is to be used in the erection of an addition thereto, is in the city of Omaha, and not in the school district, but that the title is so held by the city in trust for the use of the school district.

III. The polling places at the election to vote the bonds were located at the city polling places and not at the school houses in the wards of the city.

IV. The judges and clerks appointed by the mayor for the city election were the same that acted on the bond proposition.

V. There were polled for mayor, 12,337; for treasurer, 12,318; for police judge, 12,288; for comptroller, 12,395; and the following on the bond proposition: For the bonds, 4,930, and against the bonds, 2,992 votes.

The relator agrees to produce the poll books used by the judges and clerks of election on the bond proposition.

That the levy of taxes, in the aggregate, not including the interest on the bonds in controversy, is — mills, and no more, for the year 1890.      LEE S. ESTELLE,
*Attorney for Relator.*
WM. LEESE,
*Attorney General.*

The attorney general, for the respondent, demurred to the petition, for the reason that it does not set up facts sufficient for a cause of action entitling the relator to a writ of *mandamus.* In support of this pleading he argues in his brief:

I. That under sec. 25 of subdivision 17 of chap. 79 of Comp. Stats., 1889, a vote of the district is only necessary to authorize an expenditure for school sites and buildings greater than $25,000, to be reported to the city council, who are required to make the levy, to be collected as other taxes, without authority to issue bonds.

II. That the authority to issue bonds, under sec. 28 of the same law, is under proclamation of the board of education of the district, for the submission of the proposition to the qualified voters at school meetings, at a regular election, or at an election called for that purpose; that the regular election of this state is held yearly, on the first Monday of June, and the places of election are at the school houses of the wards of the city as nearly as may be at the center of each ward. This is the only regular election of a school district in metropolitan cities, and is that referred to in sec. 28.

III. That the majority of all the ballots polled at such an election, "or at any regular election," is necessary to authorize the issuance of bonds; that the total vote polled for the office of mayor was 12,337, and the total for the school proposition submited, 4,930, and 2,992 in the negative; lacking 1,239 votes of the required majority. There was but a single set of judges and clerks appointed for the election, and, therefore, but one election held.

IV. While the law provides that no stone or brick school house shall be built on any site without first obtaining the title in fee, it is admitted that the title to the site of the high school building, sought to be improved at a cost of $75,000 in the proposition submitted, is not in the school district, but is in the city of Omaha.

V. Sec. 27, chap. 18, provides the mode of submitting propositions to be voted on for any authorized purpose. Sec. 28, chap. 18, provides, if the proposition involves the issuance of bonds, there shall be provision for levying an annual tax for the payment of interest, and no adoption is valid unless it likewise embraces the amount of tax to be levied to meet the face of the bonds and their redemption, which is not shown to have been the fact in this instance.

The act relative to public schools in metropolitan cities, approved March 31, 1887, is the latest expression of the legislative will on the issuance of bonds for school purposes.

It is confined to cities of the metropolitan class, and is sufficiently comprehensive to effect its purposes without resort to the general provisions of any prior act regulating the issuance of bonds by school districts, towns, cities, counties, or other municipal corporations. It is exclusive of other acts, and provides (sec. 1) : "That each incorporated metropolitan city * * * shall constitute one school district, and be known by the name of the school district of (name of city)."

Sec. 4 provides "That the affairs of the school district hereby created shall be conducted exclusively by boards of education, except as otherwise provided."

Sec. 5, for the holding of an annual school election on the first Monday in June of each year; that "It shall be the duty of the mayor of each metropolitan city to give public notice two weeks prior to said election and publish said notice in two daily papers, published in said city, two weeks before said election, naming the number of members to be elected and the location of the voting places, which several voting places shall be at a school house as near as may be at the center of each and every ward in said city."

Sec. 6: "That the ballots for the election of members of boards of education, for authorizing the issuance of bonds, or the purchase of sites and the erection of buildings, shall in all cases be deposited in boxes especially prepared for that purpose, and be received and returns made by the regular election board, but the returns of election of members shall be canvassed in the same manner as provided for in case of city officers; the returns for the issuance of bonds, purchase of sites, and erection of buildings shall be made to and canvassed by the board of education."

The provisions of this section are evidently confined to the regular school election, which is also confined to the election of members of the board of education, authorizing the issuance of bonds, the purchase of school sites, and the erection of buildings.

30

Sec. 28 provides "That the board of education may borrow money upon the bonds which they are hereby authorized and empowered to issue, bearing a rate of interest not exceeding six per centum per annum, payable annually or semi-annually, at such place as may be mentioned upon the face of said bonds, which loan shall be paid and reimbursed in a period not exceeding thirty years from the date of said bonds; *Provided*, That no bonds shall be issued, nor question of issue be submitted to the electors without the consent of two-thirds of all the members of the board of education, and be offered in open market, and sold to the highest bidder for not less than par value on each dollar; *And provided further*, That no bonds shall be issued by the board of education without first submitting the proposition of issuing said bonds, at an election called for that purpose, or at any regular election, notice whereof shall be given for at least ten days in one or more daily papers published within the district, to the qualified voters of said district, and if a majority of the ballots polled at such an election shall be for issuing bonds said board of education may issue bonds in such an amount as shall be named in their election notice; said election shall be held under the proclamation of the board of education, and in the form and manner as prescribed by law for elections in metropolitan cities."

Sec. 29: "That in case the electors shall sanction the issuing of said bonds in manner aforesaid, then the said board of education may cause to be prepared and issue the same under the provisions of this act, and the said bonds shall express on their face that they are issued in pursuance of this act, and shall be signed by the president and secretary of the board of education, shall specify the rate of interest, the time when the principal and interest shall be paid, the place of such payment, and each bond when so issued shall not be for a less sum than fifty dollars."

Applying the language of section 28 to that of section

6, it will be seen that an election held under the provisions of the last mentioned section, a proposition to issue bonds might be defeated by failing to receive votes equal in number to "a majority of the ballots polled at such an election" upon a proposition for the purchase of sites, or the erection of buildings.

The further proviso of section 28 provides for the submission of a question of the issuing of bonds "at an election called for that purpose, or at any regular election." It is contended by the respondent that this language means any regular school election, and excludes any regular city, county, or state election. It must be admitted that the language of the act, as well as the arrangement of its several provisions, is far from felicitous or clear, and if the words quoted were to be taken at their own meaning, without reference to other provisions of the context, such contention would be conceded. But, by reference to the proviso of section 25, it will be seen that it is there provided, in express terms, that when "the purchase of school sites and the erection of buildings shall require an expenditure exceeding $25,000 for any one calendar year, the question shall be submitted to a vote of the electors of the district, at the time and place of any city, county, or state election." It thus appears not to have been the settled purpose of the legislature to confine these submissions to school elections, but in this instance expressly provided that the board of education may avail themselves of the means of other elections. I say this, although the proviso speaks only of "the time and place" of any city, county, or state election for such submissions. I will assume that it was not intended to empower the board of education to set up a separate and independent election "at the time and place" of any city, county, or state election. So that the language must be construed to mean that the question might be submitted to a vote of electors at any city, county, or state election.

468 NEBRASKA REPORTS. [VOL. 29

State, ex rel. Bd. of Education, v. Benton.

The legislature having thus provided in section 25 for the submission of the question of the purchase of sites and the erection of buildings to a vote of the district at any city, county, or state election, when in the further proviso of the 28th section, it comes to provide for the submission of propositions for the issuance of bonds, if the language there used will admit that such question may be submitted to the same election, it should be so construed, rather than a different construction providing for the submission of these questions, so similar in object and character, by the same authority to different and distinct elections. The language there used not only admits of such construction, but it is its primitive meaning. The city, county, and state elections are held annually upon a day established by law, and their organization and methods regulated by the same authority. They are, therefore, regular elections, and that which may be done "at any regular election" may be done at any of these. But in the submission of the prodosition to issue bonds, the board of education was not restricted to the elections of which we have been speaking. They might have submitted it at an annual school election, which is also a "regular election," or "at an election called for that purpose," although the power to call special school elections does not seem to be expressly given aside from the language quoted. By submitting the question at a general city election, they adopted such election with its advantages, and with whatever disadvantages it might possess.

Referring again to the further proviso of sec. 28, it appears to be only upon the condition that "a majority of the ballots polled at such an election shall be for issuing bonds" that the proposition shall be held to have carried, or that, in the language of sec. 29, "the electors shall sanction the issuing of said bonds in the manner aforesaid." This brings us to the main question involved : Was there "a majority of the ballots polled at such an election" for issuing bonds?

The case of *State v. Babcock*, 17 Neb., 188, turned upon
the construction of the language of the constitution of the
state in sec. 1, art. XV, providing the manner of an
amendment of that instrument, viz. : "Either branch of the
legislature may propose amendments to this constitution,
\* \* \* at which election the same shall be submitted to
the electors for approval or rejection, and if a majority of
the electors voting at such election adopt such amendments,
the same shall become a part of this constitution." A prop-
osition had been submitted at a general state election to
amend the constitution in the article fixing the term of of-
fice and compensation of the members of the legislature.
At this election there were cast, for senators and represen-
tatives, 132,000 votes; for the amendment, 51,957, and
against it, 17,766 votes.   The state canvassers had declared
the amendment not adopted.   Mr. Stevenson, a member of
the legislature, for the purpose of procuring a construction
of the constitutional provision involved, demanded of the
auditor of public accounts a warrant for his compensation
as a member of the legislature, at the rate fixed by the pro-
posed amendment, which being refused, he applied for a
*mandamus* in this court.   Upon hearing, and in the opin-
ion, the majority of the court, following an earlier case,
(*State v. Lancaster County*, 6 Id., 474), held that the prop-
osition not having received a majority of the votes, or a
number equal to a majority of the votes cast for senators
and representatives at such election, was defeated and lost;
that the words of the constitution, "at such election," refer
to the election for senators and representatives.   The pres-
ent writer did not then concur with the majority of the
supreme court in that opinion, but submitted dissenting
views.   Substantially the same question, though different
in form, was again considered in the case of *State v. Bechel*,
22 Id., 158, which arose upon an application for a peremp-
tory *mandamus* to the city clerk and council of the city
of Omaha to compel them to certify the result of an elec-

tion held in said city May 3, 1887, at which it was alleged that a majority of the electors had given their consent to the construction of a street railroad by the relator upon the streets of the city. This election was held upon the day and at the places of holding the general annual city election. The registry of voters for the city election contained the names of 10,045 voters; there were 8,146 votes cast at the election. The number cast upon the question of consent to the construction and operation of the street railroad was 1,650, of which 1,470 were for the railroad and 180 against it. The case turned upon the construction of the language of sec. 2 of art. XI of the constitution. The first section of the article provides for the organization of all corporations thereof to be created by general laws. The second provides that "no such general law shall be passed by the legislature granting the right to construct and operate a street railroad within any city, town, or incorporated village without first requiring the consent of a major-ity of the electors thereof." In the opinion delivered, the court followed the rule of *State v. Babcock, supra,* and held that the majority of the electors whose consent was required to the construction and operation of the railroad was the majority of the electors voting at the city election either upon any proposition submitted, or for the candidates for any office to be filled thereat; and that the consent was not given for the reason that the number of votes therefor was less than that cast for the office of mayor at said election. The writer concurred in that opinion, not that he assented to its conclusions as an original proposition, but because it had become the settled rule of construction of the court, and was, therefore, no longer to be disputed.

In the case at bar it is argued with force that there was a difference, and that a distinction should be made between the language of the constitution construed in Stevenson's case, as well as that in the street railroad case, and that of

the further proviso to sec. 28 of the act which we are now considering, but I am unable to clearly see the difference insisted upon, or to draw the line of such distinction; and, following the cases mentioned, it must be held that the proposition to issue bonds failed of adoption, and was not sanctioned by the electors, because it did not receive a number of votes in its favor equal to a majority of the ballots polled for the office of mayor at the same election.

It is probably true that the objection to the bonds, above discussed, was not raised until after the information by the relator was filed, and that the sole objection originally made to the registration of the bonds was that the proposition submitted to and voted upon by the electors contained no provision for levying a tax to pay the interest on the bonds to be issued, and this objection is urged by counsel for respondent.

Section 27 of chapter 18 of the Compiled Statutes provides the mode of submitting propositions to the people, and the following section, 28, further provides that " when the question submitted involves the borrowing or expenditure of money, or issuance of bonds, the proposition of the question must be accompanied by a provision to levy a tax annually for the payment of interest, if any, thereof, and no vote adopting the question proposed shall be valid, unless it likewise adopt the amount of tax to be levied to meet the amount of liability incurred." If this provision of law is applicable to the election provided to be held for the issuance of bonds, by the act of March 31, 1887, which we have been considering, then, as the proposition submitted by the board of education for the issuance of bonds contained no provision for the levy of a tax to pay the interest on such bonds, the vote upon such proposition, whatever majority of the ballots cast at said election was in favor thereof, was ineffectual to sanction the issuance of bonds. The provision last above quoted is first found in its present form as section 28 of the act entitled "An act

concerning counties and county officers," approved March 1, 1879. As originally published in the General Statutes of 1873 (sec. 19, chap. 13), it did not contain the words "or issuance of bonds," but referred only to cases involving the borrowing or expenditure of money. The act of 1879 purports to be an original and not an amendatory act. Neither of those acts contain within the scope of their language or intent, so far as I can see, the subject of school district bonds, or the rights or powers of school district officers. The act of March 31, 1887, while it does not purport to be an amendatory act or a re-enactment, is, in respect to the provisions involving the question now under consideration, a re-enactment of the act entitled "An act relating to public schools in cities of the second class where graded and high schools are, or hereafter may be, established," approved February 25, 1875, with the exception that, by the provisions of the act last mentioned, two-thirds of the ballots polled at such election were required to be for the issuance of bonds in order to sanction the issuance thereof. In all other respects sections 29 and 30 of said act are substantially, if not literally, copied into sections 28 and 29 of the act of March 31, 1887, now under consideration. These provisions are therefore older than those of the act of 1879 and were not repealed by it; and even had they been repealed they were re-enacted in substance after the date of that act as stated.

I therefore reach the conclusion, that the provisions of the act of March 31, 1887, are not controlled or affected by those of section 28 of chapter 18 of Compiled Statutes.

As before stated in this opinion, the act of March 31, 1887, (Laws, 1887, p., 599,) purports to be an act perfect in itself for the purposes of its object. Section 30 provides "That the board of education is hereby authorized and required to provide, before the same shall become due, for the interest on all bonds issued by the district; they shall also, immediately after the expiration of one-half of the time

for which said bonds are issued, proceed to set apart each year, for a sinking fund, a requisite amount or proportion sufficient to pay the principal of said bonds when they shall become due," etc. These provisions give the board of education authority, full as well as imposes upon them the duty, to levy taxes to pay the interest on the bonds in question as though the proposition to issue the bonds had contained a provision for levying the same. I am, therefore, of the opinion that the law does not require that a proposition submitted by the board of education of a metropolitan city to the electors for the issuance of bonds be accompanied with a provision for the levy of taxes to pay the interest on such bonds.

A third point was presented in the case on the part of the respondent in a brief by Hon. Charles H. Brown. This point is primarily addressed to the $75,000 of bonds contained in the proposition submitted, as for the erection of an addition to the high school building, and secondarily, to all of the bonds claimed to have been voted, for the reason that they were all incorporated in the one proposition, or one ticket, and if part were for an unlawful or unauthorized purpose, the whole proposition, even if in form adopted, must fail. The ground of objection as to the $75,000 of the bonds is that the title to the land upon which the high school building is erected, and to which it is proposed to erect an addition with these funds, is not in the school district. It appears from an examination of the act approved February 4, 1869, (Laws 1869, p. 232,) to which we are cited, that by the terms of said act "the said capitol building and the grounds surrounding the same and whereon the same stands, known and designated on the lithograph plat of said city as Capitol square, was declared to 'revert to, and vest in said city of Omaha for school purposes; * * * *Provided,* That the said property shall be used by said city for the purpose of a high school, college, or other institution of learning, and for no other purpose

whatever; *And provided further*, That said city shall never alien, convey, lease, or in any manner incumber the same."

The second and third sections of the act provide that Alvin Saunders, and his associates mentioned, and their successors, are appointed a board of regents to serve, the two first for three years, the two next for two years, and the two last for one year; the term of each to commence from February 4, 1869, and run for the full term herein named after the general election for city officers in Omaha in 1869, so that two of said regents shall be chosen by the qualified electors of said city at the general election of municipal officers in 1870, and two at each annual election thereafter. The said board, or a majority of them, shall receive, in behalf of said city, from the state the aforesaid property, and shall take possession of the same and manage and control said high school, college, or other institution of learning so to be established, and provide such rules and regulations for the government of the same as to them shall seem expedient. Said regents shall continue in office until their successors are duly elected and qualified as hereinbefore provided.

"Sec. 3. That in case of death, resignation, refusal to serve, removal from said city, or other disability of one or more of said regents, the remaining members shall fill said vacancy or vacancies until the next general election for city officers of said city. The said regents shall appoint a treasurer, who shall give such bonds as they shall prescribe, and hold his office during the pleasure of the board, which said officer shall receive for his services such reasonable compensation as shall be prescribed by said board. The acts of a majority shall in all respects be as binding and valid as if concurred in by the whole number of regents hereby appointed. That no college, school, seminary, or other institution of learning shall ever be kept in said buildings or upon said grounds, or any portion thereof, the control or management whereof shall be placed under

the direction of any religious sect or denomination whatever."

On February 7, 1871 (p. 183), an act was passed entitled "An act to authorize the board of regents of the high school on Capitol square, in the city of Omaha, to issue bonds." Section 1 of said act provided that the board of regents should have power to issue bonds not exceeding $100,000 to aid the object and purpose of the act creating such board. Section 2 provided that the bonds should be of such denomination as the board should determine, payable fifteen years from date severally, bearing interest at ten per cent per annum, payable semi-annually in advance. Sections 3 and 4 provided for the submission of the question of the issuance of such bonds to a vote of the electors of the city of Omaha at some general or special election, prescribing the duties of said board in respect to the issuance of such bonds in case the electors should sanction the same, substantially as is provided in the act of March 31, 1887.

On June 5, 1871 (p. 185,) an act was passed entitled "An act to amend an act entitled an act to authorize the board of regents of the high school on Capitol square, in the city of Omaha, to issue bonds." This act, amongst other things, provided, in section 2, that whenever the high school building, contemplated by the act to which said act was amendatory, "shall have been completed, it shall be and remain one of the public school buildings of the city of Omaha, and the school to be kept therein shall be and remain a part of the public schools of said city, to be conducted and controlled as such under such regulations and provisions as the legislature may hereinafter make or establish."

Again, on June 6, 1871 (p. 177), an act was passed entitled "An act relative to schools in the city of Omaha." Sec. 1 provided " That the city of Omaha, excepting a certain part of said city to be hereinafter designated in this act, shall constitute one school district, and all schools organized

therein under the general school law, or under special acts creating and authorizing the board of high school regents in Capitol square in the city of Omaha, and all schools hereafter to be erected or organized within the limits of said city, shall, under the direction and regulations of the board of education, authorized by this act, be public and free to all children residing within the limits of said city between the ages of five and twenty-one years." Sec. 2 and subsequent sections provided for the election of a board of education for said city, prescribed its powers and duties, and, amongst other things, prescribed the mode by which the board might submit the question of issuing bonds, and issue and dispose of the same in case such proposition was sanctioned by a majority of the ballots polled at the election called for that purpose, in all respects substantially as provided by the act of March 3, 1887.

It is a matter of public history that under some, or all, of these acts the board of education of the city of Omaha has raised funds by the issuance of bonds, and has constructed a spacious and imposing school building on the Capitol square referred to, and that it has been treated as one of the public school buildings of the school district which is co-extensive with the city.

It is admitted that the legal title to Capitol square is in the city of Omaha, but that the city holds it in trust for the general purposes of education without power to alienate or incumber it.

I am of the opinion that the board of education may, under the authority and sanction of the electors of the district expressed in the manner pointed out in the statute, expend the public school money derived from the sale of bonds, or otherwise, in the erection of school buildings on said Capitol square.

For the reasons expressed under the first head, the writ is denied.

WRIT DENIED.

THE other judges concur.