THE STATE OF NEBRASKA, EX REL. THOMAS B. STE-
VENSON, V. H. A. BABCOCK, AUDITOR OF PUBLIC
ACCOUNTS.

Constitutional Law: AMENDMENTS TO CONSTITUTION. The votes
necessary to adopt an amendment to the constitution under the
provisions of sec. 1, Art. XV. of the same, must be a majority
of all those cast in the state at that election for senators and rep-
resentatives.

ORIGINAL application for mandamus.

*J. N. Paul, W. H. Snell, A. C. Troup, E. H. Peterson,*
and *M. L. Hayward,* for relator, cited: *Gillespie v. Palmer,*
20 Wis., 572. *Dayton v. Saint Paul,* 22 Minn., 400.
*County of Cass v. Johnston,* 5 Otto, 360. *Saint Joseph v.*
*Rogers,* 16 Wall., 664. *People v. Garner,* 47 Ill., 523.
*L. & N. R. R. v. County,* 1 Sneed, 691. *State v. Clark,*
54 Mo., 39. *People v. Wiant,* 48 Ill., 266. *County Seat*
*of Linn County,* 15 Kan., 525.

*William Leese, Attorney General,* for respondent, cited:
*Enyart v. Trustees,* 25 Ohio State, 618. *State v. Sutter-*
*field,* 54 Mo., 391. *Everett v. Smith,* 22 Minn., 53.
*State v. Swift,* 69 Ind., 505.

MAXWELL, J.

This is an application for a mandamus to compel the
auditor to draw a warrant in favor of the relator at the
rate of $5.00 per day for services rendered by him as a
member of the legislature. In 1883 the legislature sub-
mitted to the electors of the state the following proposition
to amend the constitution: The term of office of members
of the legislature shall be two years, and they shall receive
a salary of three hundred dollars for their services during
said term, and ten cents for every mile they shall travel in

going to and returning from the place of meeting of the legislature, on the most usual route; *Provided, however,* That neither members of the legislature nor employees shall receive any pay or perquisites other than their salary and mileage. Each session, except special sessions, shall be not less than sixty days. After the expiration of forty days of the session no bills nor joint resolutions of the nature of bills shall be introduced unless the governor shall by special message call the attention of the legislature to the necessity of passing a law on the subject matter embraced in the message, and the introduction of bills shall be restricted thereto; *Provided,* The ballots at said election shall be in the following form: " For proposed amendment to the constitution relating to legislative departments; " " Against proposed amendment to the constitution relating to legislative department." Section 1 of article XV. of the constitution provides: "Either branch of the legislature may propose amendments to this constitution, and if the same be agreed to by three-fifths of the members elected to each house, such proposed amendments shall be entered on the journals, with the yeas and nays, and published once each week in at least one newspaper in each county where a newspaper is published for three months immediately preceding the next election of senators and representatives, at which election the same shall be submitted to the electors for approval or rejection, and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this constitution." * * * It is agreed by the parties that the whole number of votes cast at the election in November, 1884, was 134,000 for governor and other state officers, and 132,000 for senators and representatives; and in favor of the proposed amendment 51,959, and 17,766 against the same. If the 51,959 votes cast in favor of the proposed amendment are sufficient to adopt the same and make it a part of the constitution, then the relator is entitled to the writ, otherwise not.

The language of section 1, article XV., is that "*if a majority of the electors voting at such election* adopt such amendments the same shall become a part of this constitution." This would seem to require a majority of all the votes cast at that election, otherwise the words " voting at such election" would be entirely without meaning. But those words evidently were intended as a restriction upon the right to change the fundamental law, and not permit a minority of the people of the state to incorporate new provisions therein. And this view is strengthened by an examination of section 2, article XV., where it is provided that a new constitution, when "submitted to the electors of the state and adopted by a majority of those voting for and against the same, shall then take effect in the manner therein provided.

The question here involved was before this court in *State v. Lancaster County*, 6 Neb., 474. In that case the question of township organization was submitted to the electors of Lancaster county, and 952 votes were cast in favor of and 601 against the same, while the whole number of votes cast in the county at that election for the various officers voted for was 2,451.

Section 5, article X., of the constitution provides that " the legislature shall provide by general law for township organization, under which any county may organize whenever a majority of the legal voters of such county *voting at any general election* shall so determine." It was held that, as it required 1,226 votes to constitute a majority of all the voters who voted at such election, therefore township organization was not adopted.

In *People v. Brown*, 11 Ill., 479, the sixth section of the seventh article of the constitution of that state declared that "The General Assembly shall provide by a general law for a township organization, under which any county may organize whenever a majority of the voters of such county at any general election shall so determine." At

the general election in Woodford county in the year 1850 more than 600 votes were cast in the county, while but 153 votes were given for and 107 against township organization. The court say (page 480): " But one-fourth of the voters of Woodford county cast their suffrages in favor of township organization. It is clear, therefore, that the township law has not been legally adopted in that county."

In *Enyart v. Trustees, etc.*, 25 Ohio State, 618, the act of the legislature authorized the trustees of a township to levy a special tax for the purposes stated in the act, but with a proviso "that said trustees shall not cause said levy to be made until a majority of the electors of said township at some regular election shall vote in favor of said levy." The election at which the question of levying the tax was submitted was a presidental election, and it was held by the supreme court of Ohio that the votes cast for President and Vice-President furnished the basis by which it was to be determined whether or not the levy was authorized. In the opinion "by the court" it is said "The record shows that although the number of votes in favor of levying the tax was a majority of the votes cast on that question, they were not a majority of all the votes cast for electors of of President and Vice-President, and hence the levy was never authorized."

The case of *The People v. Wiant*, 48 Ills., 263, was an application for a mandamus to compel the county treasurer to remove his office to the town of Wheaton, which, it was alleged, had been recently selected as the county seat of Du Page county. The act under which the election was held provided that if it should appear upon a canvass of the votes that a majority of the legal voters of the county had voted for the removal to Wheaton, then that place should be the county seat of said county. The returns of the election showed that more votes were cast for the selection of a circuit judge than upon the question of the re-

moval of the county seat; and that while a majority of the votes cast upon the question of county seat removal were in favor of such removal, yet there was not a majority of the whole vote cast and the mandamus was denied.

Walker, J., in delivering the opinion of the court, said: "It is not the vote cast upon that single question that is to govern, where it occurs at any other election held at the same time, but it must appear that a majority of all the votes cast at that election were in favor of the removal."

In *The State v. Winkelmeir*, 35 Missouri, 103, the legislature had given permission to the county of St. Louis to allow the sale of refreshments on any day of the week when authorized by a majority of the legal voters of the respective cities. Five thousand votes were cast for such permission out of thirteen thousand cast for city officers at the election on the same day, it was held not the vote of a majority, although only two thousand votes were cast against the proposition, and that no authority for such sales were given by the election.

In *Everett v. Smith*, 22 Minn., 53, the constitution of the state declared that "all laws for removing county seats shall, before taking effect, be submitted to the electors of the county or counties to be affected thereby at the next general election after the passage thereof, and be adopted by a majority of such electors." It was *held* by the supreme court "that the words 'majority of such electors' as used in the provision of the constitution mean a majority of the electors voting at the election." And the same was held in *Taylor v. Taylor*, 10 Minn., 107, and in *Bayard v. Klinge*, 16 Id., 249.

It may be seen by reference to *Redden v. Smith, supra*, the construction placed upon the language of the constitution of Minnesota is in exact accordance with the *language* of the clause of the constitution of Nebraska now under consideration, viz., "a majority of the electors voting at such election." And in *Bayard v. Klinge, supra*, the legis-

lature had passed an act for the removal of the county seat of Wabasha county from Wabasha to Lake City, but by the seventh section of said act it was provided that the act should take effect and be in force after its submission " to the election of said county at the next general election after the passage thereof, and its adoption by a majority of such electors voting thereon." The court held the act of the legislature to be in contravention of the constitution, and that the language of the constitution and of the act of the legislature were not of the same meaning. The court, by Chief Justice Ripley, say : " Hence, considering that the constitution requires such law to be submitted to the electors at a general election; that the returns would show the actual number of persons present at such election *voting on any question ;* that as a general rule it is the duty of every elector to attend and vote at such general election; and that the law presumes that every citizen does his duty,— they (the court) hold that in the eye of the law those present and voting at such election, not on any such question then submitted, but on any question then to be voted on, constitute the electors of the county, in the sense in which article 11, § 1, of the constitution uses those words; that is to say, that body, the adoption by a majority of whom, of such a law as is there referred to, would be the adoption thereof by a majority of the electors of the county." Again the court in that case, in speaking of the great length which the respondent desires it to go, say : That he would have it annul the former decision of the court in *Taylor v. Taylor* " by holding that ' a majority of such electors ' does not mean a majority of those voting thereat, but a majority of those who may see fit to vote thereat on this particular question. We see nothing either in principle or authority to justify us in so doing."

While we cannot endorse some of the reasoning in the opinion of the majority of the court in *The State v. Swift,* 69 Ind., 505, yet that case fully sustains the principle here

13

contended for.    Indeed we are supported by the dissenting
opinion of Niblock, J.    In that case the act by which the
proposed constitutional amendments were submitted pro-
vided that it should be so submitted at the election to be
held in April, 1880, for their adoption or rejection, and
that "if a majority of the electors shall thus ratify any of
said amendments the same shall be a part of the constitu-
tion."    The April election was the township election,    No
state officers were voted for.    The question of the amend-
ments were the only questions requiring a state canvass of
the votes.    It would seem that the only criterion by which
the vote of the state could be ascertained was the vote upon
that question.    Yet it was held that the amendments were
defeated, because it did not affirmatively appear that a ma-
jority of the votes cast at the election were in favor of the
amendments, notwithstanding the fact that a majority of
over seventeen thousand votes were in favor of the amend-
ments. The dissenting opinion of Niblock, J., at page 531,
lays down the rule that a majority of the votes cast is suffi-
cient, unless there be some statutory or constitutional pro-
vision to the contrary.    In this case we have the constitu-
tional provision, clear, concise, and unambiguous. It must
be "a majority of the electors voting at such election." The
returns of the election furnish an infallible criterion by
which that majority can be ascertained, and it will not do
to say that the term "election" in that sentence refers to
the vote upon the question of the adoption of the amend-
ment instead of the election of senators and representatives.

The case of *Gillespie v. Palmer*, 20 Wis., 572, and *Stan-
ford v. Prentice*, 28 Id., 358, were carefully considered by
this court in *State v. Lancaster Co.*, 6 Neb., 474, and we
then refused to follow them, the court being unanimous.
We entertain high regard for that able court; and its de-
cisions are entitled to great weight, but we are unable to
give our assent to the views expressed in the cases cited,
and see no good reason for overruling our decision in *State*

*v. Lancaster County.* In that case township organization was to be adopted "whenever a majority of the legal voters of such county voting at any general election shall so determine." In this case an amendment to the constitution will be adopted "if a majority of the electors voting at such election adopt" the same. This requires affirmative action. A majority of all those voting at the election must vote in favor of the proposition in order to adopt the same. The convention that framed the constitution doubtless presumed that if an amendment was necessary and really desired by the people, a majority would favor its adoption, hence, before an amendment can be submitted to the people, at least three-fifths of the members elected to each house must agree to the proposed amendment. It must then be submitted to the electors for approval or rejection. The submission must be at an election when senators and representatives are to be elected, and a majority of those voting at such election are required to vote in favor of the proposition to adopt the same. The words "such election" evidently refer to the election for senators and representatives.

The rule of construction, as applied to statutes and constitution, is to compare and consider the several parts of the section, act, or article, as the case may be, and deduce therefrom the purpose and intent of the law-giver. *State v. Gosper et al.*, 3 Neb., 285. Applying this rule to section 1, Art. XV., we have no doubt a majority of all the votes cast at the election was intended. In the absence of a statute or constitutional provision requiring a majority of all the votes cast to be in favor of a proposition, there is no doubt that a majority voting upon that question would be sufficient. In such case, no doubt, the failure of a party to vote upon the question may be considered as tacit assent to the will of the majority of those voting thereon; but such a rule cannot apply where a majority of the electors of the state voting at the election are required to vote in

favor of a proposition to secure its adoption. In such case the votes in the affirmative must exceed one-half of the total of the votes cast for senators and representatives.

It is a matter of regret to the members of this court that we are compelled to make this decision, as it must be conceded that the time allowed for a session of the legislature is inadequate, and the compensation of the members far below what it should be. But while we lament the result of the election, it is not within the power of the court to change that result. It is not the duty of the court to say what the result *should* have been or must be, but to ascertain what that result *has* been, and in the light of the constitution the former decisions of this court, and the well-considered decisions of other courts on similar questions, declare the law as we find it.

We hold, therefore, that the amendment, not having received the approval of a majority of the electors voting at the election at which it was submitted, was not adopted. The writ must therefore be denied.

WRIT DENIED.

REESE, J., concurs.

COBB, CH. J., dissenting.

Being unable to concur in the opinion of the majority of the court, and having no disposition to criticise it, I will content myself with a brief statement of my views of the question submitted, with the preliminary statement that it is the duty of the court, and of each member of it, to expound the constitution as they understand it, without regard to questions of convenience, the responsibility for which rests with the people of the state in their political capacity.

The sole question presented for our consideration is, whether, under the provision of the constitution providing

for its own amendment, it is sufficient that the proposed amendment receive a majority of the votes cast for and against it, or is it necessary that it receive a majority of the votes for and against that proposition, or the several candidates for that office, voted upon at the same time, upon which the greatest number of electors exercised the rights of voting. The section of the constitution directly governing the question under consideration is as follows: "Article XV., section 1. Either branch of the legislature may propose amendments to the constitution, and if the same be agreed to by three-fifths of the members elected to each house, such proposed amendments shall be entered on the journals, with the yeas and nays, and published at least once each week in at least one newspaper in each county where a newspaper is published for three months immediately preceding the next election of senators and representatives, at which election the same shall be submitted to the electors for approval or rejection, and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this constitution."   *   *   *

Now, in what sense is the word election, when last used in this section, to be understood? Is it to be confined to that general sense in which we speak of a certain day, between certain hours, the polling places, the inspectors and clerks, the poll books, ballot boxes, ballots, etc., as the election, or does it not mean that choosing between the adoption or the rejection of the proposition submitted, which is the object and purpose of the submission?

The word election is defined by Webster as follows:

1. The act of choosing; choice; the act of selecting one or more from others.

2. The act of choosing a person to fill an office or employment, by any manifestation of preference, as by ballot, uplifted hands, or *viva voce;* as the election of a president or a mayor.

If this authority be accepted, then the words "at such

election " must be construed to mean the same as though it read " at such act of choosing, to-wit, at the act of adopting or rejecting the proposed amendment." And, looking at the language of the constitution, I think that any other construction is strained and artificial.

In an adjudicated case, *Commonwealth v. Kirk*, 4 B. Monroe, 1, the supreme court of Kentucky has construed the word election as used in the statute of that state, and given it a meaning consistent with the above. The case arose upon an indictment against one Kirk for betting with another person a certain sum of money that one Dobyns, who was a candidate for representative, would not receive six hundred and fifty votes for said office. The statute under which the indictment was found provided "That if any person shall wager or bet any sum of money or other thing upon the election of the officers aforesaid (among whom are members of the general assembly), within six months next before said election, he shall forfeit and pay the sum of one hundred dollars, to be recovered by indictment." The court, in construing the said act, used the following language. " An election is the voting and the taking of the votes of the citizens," etc.

Let us read that part of the section of our constitution applicable to the question under consideration, substituting for the word " election," where it last occurs therein, the words of the court in the above case : " And if a majority of the electors voting at such voting, and the taking of the votes of the citizens, adopt such amendments, the same shall become a part of this constitution." Read in this way the mind is confined to the expression of the voters upon the question submitted to them for adoption or rejection, without reference to the other proceedings, which in my judgment are only named for the purpose of designating the time as the proper one for the submission of such question for that purpose.

Section 1 of article 3 of the constitution of Wisconsin

provides that white male persons over the age of twenty-one years, who have resided in that state one year next preceding any election, and who are citizens of the United States, or have declared their intentions to become citizens, and also certain persons of Indian blood, shall be deemed qualified electors at such election. Then follows a proviso in the following words: " *Provided*, That the legislature may at any time extend by law the rights of suffrage to persons not herein enumerated; but no such law shall be in force until the same shall have been submitted to a vote of the people at a general election and approved by a majority of all the votes cast at such election."

An act was passed by the legislature of that state, pursuant to the above proviso, and submitted to the people at a general election, at which there were 5,265 votes cast for said law and 4,075 against it, while there were at least thirty thousand votes cast for and against the state officers elected at the said election.

The case of *Gillespie v. Palmer*, 20 Wis. R., 572, arose under the above law; the plaintiff, a mulatto, having offered to vote at a subsequent election, and his vote having been rejected by the defendant and others, inspectors of the election.

The sole question was, whether the law had been approved by a sufficient majority. The united court were of the opinion that it had been, and I think the reasons for the opinion given by Judge Downer and Chief Justice Dixon are quite satisfactory; and, while it is not my purpose to further comment on that case, I will observe that the language of the proviso construed by them is scarcely distinguishable from that of the section of our constitution now under consideration. The above case was followed and expressly approved in the same court in the case of *Stanford v. Prentice*, 28 Id., 358.

The case of the *State v. Swift*, 69 Ind. R., 505, relied on by the attorney general, counsel for respondent, is a

strong case for that side, and still it cannot be admitted that the language of the section of the constitution of that state, construed by the court in that case, is the same as that of our own now under consideration. There, after providing for the proposed amendments being agreed to by a majority of the members elected to each house and referred to the general assembly next to be chosen, the section continues, "and if, in the general assembly so next chosen, such amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of general assembly to submit such amendment or amendments to the electors of the state, and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution."

It is noticeable that neither the word election or voter occurs throughout the section as applicable to the adoption of the amendments. The word election is not exactly the equivalent of the word voter. As said by Ch. J. Dixon in *Stanford v. Prentice, supra:* "The primary and proper signification of the words 'legal voter' is, persons qualified by law to vote, and who do vote. There is a difference between an elector or person legally qualified to vote and a voter. In common parlance they may be used indiscriminately, but strictly speaking they are not the same. The voter is the elector who votes—the elector in the exercise of his franchise or privilege of voting—and not he who does not vote."

Again, it will be noticed that the decision in the Indiana case is predicated mainly upon the intention of the convention which framed the constitution, as shown by the debates and amendments to the section adopted and rejected, and not upon the language itself. The former source of interpretation is denied us, as no record of the debates of our convention was preserved.

I do not think that any purpose would be subserved by

a discussion of the cases cited by counsel where in the several states of Ohio, Illinois, Missouri, Kansas, Minnesota, and our own state the supreme courts have construed their several statutes providing for submitting to the people of questions for the removal of county seats, the adoption of the township system of government, making donations to works of internal improvement, and similar matters. In none of them is the language construed the same as that of the section of our constitution now being considered, and while I do not claim that the majority of them sustain the position of the relator, I by no means concede that they are against him.

· I am of the opinion that the so-called legislative amendment was adopted by a sufficient majority and has become a part of the constitution, and that the relator is entitled to the writ of mandamus.