TECUMSEH NATIONAL BANK V. ANNA B. SAUNDERS.

FILED JUNE 3, 1897.   No. 7028.

51   801
57   506
51   801
f59  708
f59  710

1. **Rehearing.** A rehearing will not be granted when it is clear that no other conclusion than that already reached is possible.

2. **Constitutional Amendments:** SUBMISSION OF PROPOSITION: ELECTIONS. A proposition to amend the constitution of this state can only be submitted at a general election at which there are elected senators and representatives.

3. ———: ———: ———: RESULT. To effect the adoption of an amendment to the constitution of this state submitted by the legislature it must receive more than one-half the highest number of votes cast at such general election, whether such highest number be for the filling of an office or for the adoption of a proposition.

MOTION by defendant in error for rehearing of case reported in 50 Neb., 521. *Rehearing denied.*

*T. Appelget* and *J. Hall Hitchcock,* for the motion.

RYAN, C.

An opinion was filed in this case February 3, 1897, and reported in 50 Neb., 521. There has been filed a petition and a motion for a rehearing, and thereon it is thought advisable that the views of this court be expressed as to other cases in which reversals were entered following the result of this case.

In *Austin v. Tecumseh Nat. Bank,* 49 Neb., 412, a petition in all essential particulars like that in this case had been held insufficient to sustain a judgment. On the oral argument of the cases it was argued that the same result must be reached as that which had been arrived at in the case above cited. In view of the unsatisfactory nature of such an adjudication, counsel for the defendant in error requested that all the cases might be considered upon the evidence rather than with reference to the petitions, at the same time stating that if the evidence was not sufficient they wished that fact determined; for, on

55

another trial, it would be impossible to make more satisfactory proofs than had been already made in the district court. There was no question made that the evidence was identical with that in each of the cases submitted by the same counsel as appeared in this case, and the entry of judgment in this case was, in this court, as we understood it, to be entered in all the cases just referred to. We might have determined this particular case upon the sufficiency of the evidence to sustain the averments of the petition in the district court, and, in its companion cases, might have reached the conclusion we did on the ground that the averments of the petition were insufficient to state a cause of action. We do not deem it necessary, however, to grant rehearings when it is clear we must again announce affirmances of judgments because of insufficient averments rather than of insufficient proofs—the essential defect being the same, under the ruling in *Austin v. Tecumseh Nat. Bank.*

From the former opinion NORVAL, J., dissented, and it is now urged that there was adopted at the general election of 1896 a constitutional amendment which increased the number of judges of this court to five and that, therefore, the concurrence of POST, C. J., and HARRISON, J., could not operate to reverse the judgment of the district court. In support of the contention that the amendment increasing the number of judges has in fact been adopted, a showing has been made that, at the time of the election above referred to, there were votes deposited for and against the said amendment in boxes used for receiving only those votes all over the state; that these votes were canvassed separately, and that the whole number of votes so cast was 122,475, of which 84,579 were in favor of the said amendment and 37,896 against. Without attempting to verify the correctness of the statements as to the number of the votes cast for and against this amendment, we shall accept the above figures as correct. It was shown, however, that the total number of votes cast for governor at the late election was 217,768, and we shall accept this

as the highest number of votes cast at said general election for any candidate.

Section 1, article 15, of the constitution of this state contains the following language: "Either branch of the legislature may propose amendments to this constitution, and, if the same be agreed to by three-fourths of the members elected to each house, such proposed amendments shall be entered on the journal with the yeas and nays, and published once each week in at least one newspaper in each county where a newspaper is published for three months immediately preceding the next election for senators and representatives, at which election the same shall be submitted to the electors for approval or rejection, and, if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this constitution." The claim of the defendants in error that there are now five judges of this court rests on the propositions that the voting on the constitutional amendment, conducted as it was, was in effect an election distinct from the election of senators and representatives, and that, therefore, the majority need be only of the number of votes cast with respect to such amendment. Some reliance seems also to be placed upon the facts that the candidates receiving the highest number of votes for said offices have duly qualified and have received from the governor certificates of their election. We shall now consider these propositions in the order above stated.

It is urged that the language "such election" in the phrase, "If a majority of the electors voting at such election adopt such amendment" refers to the vote for the approval or rejection of the proposed amendment, and that therefore the total number of votes cast at the election for senators and representatives is immaterial. If this construction is correct, the votes for and against the amendment, not being cast at a general election, must be held to have been cast at a special election, and that the only relation between these two elections was that they were held at the same time under the direction and

supervision of the same officers.  If this is true, the election with reference to the constitutional amendment is abortive, for it was not, in that event, a general election, and the constitutional requirement is that the election must be of that class, restricted to those particular general elections at which senators and representatives are chosen.  The case of *State v. Babcock*, 17 Neb., 188, is relied upon as establishing a rule different from that just announced.  The syllabus in that case is now in this language: "The votes necessary to adopt an amendment to the constitution, under the provisions of section 1, article 15, of the same, must be a majority of all those cast in the state at that election for senators and representatives."  By a reference to the original opinion filed in the above case it is found that the syllabus as originally prepared by Judge MAXWELL was written as follows: "The vote necessary to adopt an amendment to the constitution under the provision of section 1, article 15, of the same, must be a majority of all those cast in the state for senators and representatives."  This quite explicitly declared that the majority must be of the votes cast for senators and representatives.  Apparently to avoid this construction Judge MAXWELL, by interlineation, just after the word "state," wrote the words "at that election," so that the requirement of a majority should be of all the votes cast, consistently with the language of the constitution, at the election for senators and representatives instead of a majority of the votes cast for senators and representatives as otherwise might have been understood.  The words "senators and representatives" are used in this part of the constitution merely to indicate the particular general election at which a constitutional amendment may be voted upon—the majority of the votes must be a majority of all those cast at such general election.  That the above conclusion with reference to the case of the *State v. Babcock, supra,* is correct is borne out by the fact that the following language of Judge MAXWELL in respect to the adoption of constitutional

amendments was made use of in the second paragraph of the syllabus of *In re Senate File 31*, 25 Neb., 864: "The proposed amendment possesses no efficacy until approved by a majority of the electors of the state voting at the election, and the approval of the governor is unnecessary and adds nothing to the validity of such proposed amendments."

The contention that the issuance of the certificate of election to a candidate for a provisional office, evidences the creation of such office, is met by the holding in the case just cited. In the case which involved the consideration of a question quite like that now under discussion there has recently been filed an opinion by HARRISON, J., in which all the adjudications of this court on this subject have been reviewed with the same conclusion above reached. (*Bryan v. City of Lincoln*, 50 Neb., 620.) It is unnecessary at this time to do more than refer to this case, for the analogies, upon a perusal thereof, will be so apparent that comment and comparison could subserve no useful purpose of elucidation.

It has been urged that in *State v. Roper*, 47 Neb., 417, this court has recognized the rule that a majority of all the votes cast with reference to a given proposition was sufficient to effect its adoption, and that the majority of all votes cast at such election was not required. This contention has no merit, for in the case referred to the election considered was a special election, at which the only question voted on was whether the county seat of Red Willow county should be McCook or Indianola. There was, therefore, no standard of measurement possible other than the number of the votes cast on this single proposition. From a consideration of all the cases decided by this court which have a bearing upon this subject our conclusion is that to secure the adoption of an amendment to our constitution it is necessary that the favorable votes be in excess of one-half of the highest aggregate number of votes cast at said election, whether such highest number be for the selection of an officer or

upon the adoption of a proposition. The motion for a rehearing is therefore overruled.

REHEARING DENIED.

NORVAL, J., dissenting.

Being unable to concur in the conclusion reached by the majority upon the applications for rehearings in this and the several cases submitted therewith, I will briefly state my views upon the question involved.

The actions were against the Tecumseh National Bank, as successor of the Bank of Russell & Holmes, to recover moneys deposited by the several plaintiffs in the last named bank. The petition in each case filed in the court below is substantially the same as the one construed in *Austin v. Tecumseh Nat. Bank*, 49 Neb., 412, which was held not to state a cause of action. Doubtless, to render the Tecumseh National Bank liable for the delinquencies of the Bank of Russell & Holmes, more must be alleged and proven than the mere fact that the former succeeded the latter in business. It should be further shown, to establish a cause of action against the defendant below, that it was the successor of an insolvent bank, and as such came into the possession of the business and all the available assets of the first bank. (*Reed v. First Nat. Bank of Weeping Water*, 46 Neb., 168.) The petition in each of the cases substantially so alleges, and the proofs in the Saunders case support the averments. (*Hopper v. Moore*, 42 Ia., 563; *Hughes v. School District*, 72 Mo., 643; *Thompson v. Abbott*, 61 Mo., 176; *Eans v. Exchange Bank of Jefferson City*, 79 Mo., 182.) In the last case the question was presented whether the successor of a bank was liable for deposits therein. The petition, in every essential like those in *Tecumseh Nat. Bank v. Saunders* and the companion cases, was construed and held to state a cause of action. The court in the opinion say: "The only remaining question is, whether the petition alleges facts which show the liability of defendant for plaintiff's de-

mand? It expressly avers that after the National Exchange Bank went into liquidation the defendant organized as a banking corporation and came into possession of, and received as the successor of the said national bank for plaintiff's use, said sum of $1,500, deposited in the said national bank by the intestate. The demurrer admits the truth of these allegations, and if they are true, defendant is liable to plaintiff for money had and received to his use. If, as alleged, defendant is the successor of the said national bank, and the funds and property of the latter passed into the hands of the former, its liability to depositors of money in the latter bank has been expressly held in *Hopper v. Moore*, 42 Ia., 563. (See, also, *Hughes v. School District*, 72 Mo., 643; *Thompson v. Abbott*, 61 Mo., 176.) Any other doctrine, it seems to us, would be monstrous. As well contend that because one has his name changed by legislative enactment, he thereby avoids all obligations incurred in his former name. The names of banks may be changed. At the expiration of the old a new charter may be granted to the same bank, even with enlarged or restricted powers; literally it is not the same corporation, substantially it is, and to permit an escape from its liabilities by such continuances would not be very creditable to the law." After further investigation, I adhere to the opinion which I entertained in the former hearing, namely, that the petition herein states a cause of action and that the proofs sustain the judgment below.

The judgments in the companion cases were reversed on the sole ground that the evidence was insufficient to sustain the findings. The decisions were wrong, since all the evidence upon which those cases were determined by the trial court was not before us for review. A bill of exceptions was allowed by the clerk of the district court in each case, but the same does not purport to contain all the evidence adduced. The records disclose that, by stipulations of the parties in writing and orally in open court, it was agreed that the testimony introduced

in evidence on the trial in the case of Anna B. Saunders
v. Tecumseh National Bank, except certain testimony,
should be read in evidence on the trial of the other sev-
eral causes, and that bill of exceptions in said cause
should be used as a part of the bill of exceptions in said
causes.   Neither these stipulations, nor the request of
counsel upon the original submission to this court that
all the cases might be determined upon the evidence,
formed any basis for the consideration by this court of
the bill of exceptions in the Saunders case in the deter-
mining of the rights of the parties in the companion cases
submitted therewith, since such bill was not attached to
the bills in the other cases or filed therein. (*Credit
Foncier of America v. Rogers*, 8 Neb., 34; *Aultman v. Patter-
son*, 14 Neb., 57; *State Ins. Co. of Des Moines v. Buckstaff*,
47 Neb., 1; *Wood Mowing & Reaping Machine Co. v. Gerhold*,
47 Neb., 397; *Lowe v. Riley*, 41 Neb., 812; *Tecumseh Nat.
Bank v. Best*, 50 Neb., 518.)   The second paragraph of the
syllabus in the last case is as follows: "A bill of ex-
ceptions must contain all the evidence upon which ques-
tions of fact are to be determined, a reference in such bill
to evidence to be found by reference to another bill filed
in an independent case not being sufficient."   In view of
those decisions these cases could not properly be deter-
mined in this court upon the evidence; but the presump-
tion must be indulged that the findings were supported
by the proofs.   For the reasons stated the several appli-
cations for rehearing should be sustained.

The former decisions of this court in the several cases
under review were rendered by a divided court, two of
the judges voting for reversal and one for affirmance of
the judgments below, and from which it is urged that
said decisions are of no binding force or effect, the argu-
ment being that it requires three judges of this court to
pronounce a decision.   The soundness of this contention
depends upon the fact whether the following proposed
amendments to the constitution submitted by the state
legislature of 1895 to a vote of the electors were adopted

or rejected at the general election held in November, 1896:

"A joint resolution proposing to amend sections two (2), four (4), and five (5) of article six (6) of the constitution of the state of Nebraska, relating to number of judges of the supreme court and their term of office.

"*Be it Resolved and Enacted by the Legislature of the State of Nebraska:*

"Section 1. That section two (2) of article six (6) of the constitution of the state of Nebraska be amended so as to read as follows: 'Section 2. The supreme court shall, until otherwise provided by law, consist of five (5) judges, a majority of whom shall be necessary to form a quorum or to pronounce a decision.' * * *

"Section 2. That section four (4) of article six (6) of the constitution of the state of Nebraska be amended so as to read as follows: 'Section 4. The judges of the supreme court shall be elected by the electors of the state at large, and their term of office, except as hereinafter provided, shall be for a period of not less than five (5) years as the legislature may prescribe.'

"Section 3. That section five (5) of article six (6) of the constitution of the state of Nebraska be amended to read as follows: 'Section 5. At the first general election to be held in the year 1896 there shall be elected two (2) judges of the supreme court, one of whom shall be elected for a term of two (2) years, one for the term of four (4) years, and at each general election thereafter there shall be elected one judge of the supreme court for the term of five (5) years, unless otherwise provided by law; Provided, That the judges of the supreme court whose terms have not expired at the time of holding the general election of 1896, shall continue to hold their office for the remainder of the term for which they were respectively commissioned.' "

It is disclosed by the several petitions for rehearing that the total number of votes cast in the state at the general election held in the year 1896, and at which the

said amendments to the constitution were submitted for adoption or rejection, was 230,795, while said amendments only received 84,579 affirmative votes and 37,896 votes were cast in the negative; that in pursuance of statute the official returns of said election on said amendments were returned to, and canvassed by, the board of state canvassers, who declared the result as above indicated, and that said proposed amendments to the constitution were rejected "if said proposed amendments require an affirmative majority of all those voting at said election;" that in compliance with the provisions of the proposed amendment last copied above, two persons were elected as additional judges of this court contingent upon the adoption of said constitutional amendments, and they each qualified by taking and filing with the secretary of state the requisite oath of office. If the proposed amendments merely required for their adoption an affirmative vote of a majority of all the votes cast on the proposition, said amendments have become parts of the fundamental law of the state, and it is obvious the membership of this court consists of five judges, and that no two of them can render a valid judgment. The question for decision is as to requisite number of votes required to adopt an amendment to the constitution, and the determination thereof depends upon the construction to be given section 1 of article 15 of the state constitution, which, after providing for the proposal of amendments to that instrument by the legislature, and for the publication of such proposed amendments once a week in at least one newspaper in each county where a newspaper is published for three months immediately preceding the next election of senators and representatives, declares that "at which election the same shall be submitted to the electors for approval or rejection, and if a majority of the electors voting at such election adopt such amendments the same shall become a part of this constitution." One of these constructions must be placed upon the foregoing provision, namely, that the affirmative vote re-

quired to adopt an amendment to the constitution submitted by the legislature under section 1, article 15, of said instrument must be either: First, a majority of the votes cast on that proposition; or second, an affirmative vote at least equal to a majority of the electors who voted for senators and representatives; or third, a majority of all the votes cast at the election at which the amendment is submitted to the electors of the state for their approval or rejection.    There is nothing in the phraseology or the grammatical construction of the section of the constitution under consideration which would warrant the conclusion that "a majority of the electors voting at such election" means that an amendment to the constitution submitted by the legislature is adopted if it merely receives a majority of the votes cast for and against it.    If the language had been a majority of the electors voting "thereon", or a majority of the electors voting at such election "on said amendment", then the interpretation that an affirmative vote of a majority of the electors voting on such an amendment is sufficient to adopt the same would be permissible.    But the section cannot be so construed, since the language of the constitution is "a majority of all the votes cast at such election."    This is manifest from an examination of the language of section 2 of said article 15 of the constitution, which, after providing for a convention to revise and amend the constitution, declares that "no amendment or change of this constitution, agreed upon by such convention, shall take effect until the same has been submitted to the electors of the state and adopted by a majority of those voting for and against the same."

I am unable to appreciate the argument which would make the language just quoted and section 1 of article 15 synonymous.    Under no rule of construction can it be said that the language used in the two sections is expressive of the same intention or meaning.    One reads "a majority of the electors voting at such election," while the other merely requires "a majority of those voting for and

against the same" to adopt a constitutional amendment. The phraseology is materially different, and clearly indicates that it was the intention of the framers of our constitution that amendments to that instrument submitted to the people by a convention called for that purpose should be adopted by a vote different from the one required to carry an amendment proposed by the legislature. The mere reading of the language of the provisions of the two sections makes the difference plain and obvious, which it is the duty of the executive, legislative, and judicial branches of the state government alike to recognize. It is manifest that while an amendment to the constitution framed by a convention duly called for that purpose may be adopted by an affirmative vote of a majority of those voting on the proposition, an amendment prepared by the law-making body cannot be adopted by a majority of those voting thereon. This construction is in harmony with the interpretation placed by the legislature upon section 1, article 15, of the constitution. In 1889, amendments to the constitution were proposed by the legislature, the purpose of one of which was to increase the number of judges of this court from three to five, and of another was to raise the salary of each judge of the supreme court to $3,500 per annum, and the salary of each judge of the district court to $3,000 per annum. These amendments were voted upon by the electors of the state at the election of senators and representatives held in November, 1890. There were 86,418 votes for the amendment relating to the increase of judges of this court, and 53,022 votes against said amendment, being a majority of 33,396 in favor of the proposition; 69,192 votes were cast for the amendment relating to the increase of salaries of the judges of the supreme and district courts and 61,519 against it, being a majority in favor of that amendment of 7,673. The total vote of the state at the election said amendments were voted upon was 214,861. In pursuance of law, the votes on said amendments were returned to and canvassed by the legis-

lature of 1891 in joint convention, an abstract of the vote was made and the amendments "not having the requisite majority of the electors voting at the said election, as provided by the constitution of the state of Nebraska, are hereby declared lost." (House Journal, 1891, pp. 66-73.) Thus the legislature of 1891 construed said section 1 of article 15 of the constitution to mean that a proposed amendment to such instrument submitted to a vote of the people thereunder is not adopted by merely receiving a majority of the votes cast on the proposition. If the construction placed upon said section 1 by counsel for the petitioners for a rehearing is sound, then each of the amendments above referred to, proposed by the legislature of 1889, was adopted as a part of the constitution. I am not aware that anyone, either in or out of court, has ever made such a claim, or that any judge, either of this court or of the district court, has been censured by any person for failing to draw that increased salary contemplated by the proposed amendment voted upon in 1890. It is of quite recent date when the proposition was first advanced in this state that an amendment to the constitution framed by the legislature is adopted if it receive a majority of the votes cast for and against it. The language of this section 1 of article 15, as well as the adjudications in this state, are against such contention.

The second construction, namely, that it is sufficient to adopt an amendment to the constitution submitted by the legislature if it receive a majority of the votes cast for senators and representatives, is equally as untenable as the interpretation already noticed. Our constitution provides for a general election to be held annually on the first Tuesday after the first Monday in November in each year. At the election held in the odd numbered year the judges of the supreme and district courts and regents of the state university are required to be elected, while at the election in the even numbered year the governor and other executive state officers and senators and representatives are chosen. The words "next election of sena-

tors and representatives," as used in section 1, article 15, of the constitution, were intended to designate the general election at which members of the legislature are required to be chosen as the election at which amendments to the constitution framed by the legislature should be voted upon by the electors for their approval or rejection. The words "a majority of the electors voting at such election," as employed in said section, do not mean a majority of the electors voting for senators and representatives, nor an affirmative vote at least equal to a majority of those who voted for senators and representatives, but a majority of the electors voting at the election at which such amendment to the constitution is submitted to the people. This has been the construction invariably adopted by the court whenever the question has been before it for consideration. (*State v. Lancaster County*, 6 Neb., 474; *State v. Babcock*, 17 Neb., 188; *State v. Bechel*, 22 Neb., 158; *In re Senate File 31*, 25 Neb., 864; *State v. Anderson*, 26 Neb., 517; *State v. Benton*, 29 Neb., 460; *Douglas County v. Keller*, 43 Neb., 635; *Stenberg v. State*, 50 Neb., 127; *Bryan v. City of Lincoln*, 50 Neb., 620.) It would be a practical impossibility to determine whether a proposed amendment to the constitution was adopted if the vote on senators and representatives is the criterion. It would require a personal inspection of each ballot to ascertain that vote, since some who vote for senators do not vote for representatives, and *vice versa*.

*State v. Babcock*, 17 Neb., 188, has been mentioned as holding that the vote on senators and representatives is the criterion by which to determine whether a proposed amendment to the constitution has been adopted or rejected. One or two expressions contained in the opinion in that case, when considered alone, might be so construed. But the opinion, taken as a whole, clearly shows that the proposition laid down by the court was that the affirmative vote essential to adopt an amendment to the constitution proposed by the legislature must be a majority of all those cast in the state at the election at which

the same is submitted to the people. The opinion has been so considered and cited by this and other courts as upholding that proposition. In the body of the opinion the author observes: "The language of section 1, article 15, is that 'if a majority of the electors voting at such election adopt such amendments the same shall become a part of this constitution.' This would seem to require a majority of all the votes cast at that election, otherwise the words 'voting at such election' would be entirely without meaning. But these words evidently were intended as a restriction upon the right to change the fundamental law, and not permit a minority of the people of the state to incorporate new provisions therein." This language is plainly against the interpretation placed upon that decision by certain constitutional lawyers. If a proposed amendment may be adopted by reason of its having received a majority of the votes cast for and against it, or more than one-half as many votes as are cast for senators and representatives, then the very reason assigned by Judge MAXWELL for the insertion of said constitutional provision may be defeated, and the constitution become amended by the vote of the minority of the electors of the state. Again, the citing, with approval of the authorities mentioned in the opinion in *State v. Babcock, supra,* clearly indicates that it was not the intention to hold that an amendment would become adopted either by receiving a majority of the votes cast on that question, or an affirmative vote equal to a majority of the votes cast for senators and representatives. This opinion is not only fortified by the prior and subsequent decisions of this court, but is sustained by numerous adjudications upon a like point in other states. (*People v. Berkeley,* 102 Cal., 298; *People v. Brown,* 11 Ill., 478; *People v. Wyant,* 48 Ill., 266; *State v. Winkelmeier,* 35 Mo., 103; *State v. Mayor of St. Louis,* 73 Mo., 435; *State v. Francis,* 95 Mo., 44; *Taylor v. Taylor,* 10 Minn., 81; *Bayard v. Klinge,* 16 Minn., 221; *Everett v. Smith,* 22 Minn., 53; *Hawkins v. Carroll County,* 50 Miss., 735; *Cocke v. Gooch,* 5 Heisk. [Tenn.], 294; *People v. Trustees,* 70 N. Y., 28;

*Enyart v. Hanover Township*, 25 O. St., 618; *State v. Foraker*, 46 O. St., 677; *Stebbins v. Judge of Superior Court of Grand Rapids*, 66 N. W. Rep. [Mich.], 594; *State v. Swift*, 69 Ind., 505.) The precise question was determined in *State v. Foraker*, *supra*, by the supreme court of Ohio, where a constitutional provision identical with our own was construed. It was held that an amendment to the constitution required for its adoption not a majority of the votes cast for senators and representatives, but a majority of all the votes cast at the election at which the amendment was submitted to the electors of the state for their approval or rejection. The rule is tersely stated in McCrary on Elections, section 174, thus: "When the constitution refers a question to popular vote, to be determined by a 'majority of the legal voters of the county voting at a general election,' the requirement calls for a majority of those who vote on any ticket, nomination, or question at that election, not merely a majority of those who vote on the particular question presented."

For the reasons stated I entertain no doubt that the proposed amendments under consideration were never ratified by the people and, therefore, they are not part of the fundamental law. I regret that this court is forced to this conclusion, as each member thereof was favorable to the amendments and hoped they would be adopted by the constitutional vote. The business of this court demanded an increase in the number of judges, and taking the past as a criterion by which to foretell the future, it would seem, under the construction adopted, it will be almost, if not quite, impossible to change the present constitution, however meritorious may be the amendment proposed. In the language of Chief Justice Brownson, in his opinion in *Oakley v. Aspinwall*, 3 N. Y., 547: "It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if under color of construction, or upon

any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless. Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power,—some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them." The requirement of section 1, article 15, of the constitution is not satisfied by a majority of the vote cast for senators and representatives, or by an affirmative vote of not less than a majority of those who vote on the question of the adoption of an amendment to the constitution, if they are less than a majority of all who vote at the election for any purpose.

I fully concur in the views expressed by RYAN, C., in his opinion upon the constitutional question, and am authorized to state that the other judges, and commissioners, also, concur therein as well as that portion of this opinion upon the same subject.