NATHAN CAMPBELL, APPELLANT, V. PETER J. YOUNGSON ET AL., APPELLEES.*

FILED DECEMBER 18, 1907. No. 14,847.

1. **Judgment:** COLLATERAL ATTACK. Generally, where the determination of a matter has been committed to a particular administrative or legislative board or officer, and no appeal is provided for from such decision, its order or determination is final, and will not be subject to collateral attack.

2. **Injunction:** DRAINS. In a proceeding to establish a drainage ditch, if the county board possesses jurisdiction and authority to act in the premises, injunction will not lie on account of mere irregularities in the exercise of the power conferred.

3. **Statutes:** CONSTRUCTION. The doctrine of strict construction of statutes in derogation of common right is not to be so unreasonably extended as to hamper the execution of public enterprises designed for the general welfare, but at the same time property rights of individuals are not to be interfered with unless the power to do so is plainly conferred by the law.

4. **Drainage Districts:** POWER TO CREATE. The drainage act of 1881 (laws 1881, ch. 51) confers the power upon county authorities to create drainage districts for the purpose of draining "marsh or swamp lands" alone, and does not confer power to change the channel or divert the flow of running streams or natural surface water drains for the purpose of relieving the lands of riparian proprietors lower down the stream from periodical overflows in seasons of freshet.

5. ———: ———. The term "marsh or swamp lands," as used in said act, has a wider significance than the terms "marshes" or "swamps." The power is conferred by this act to drain lands which are not, strictly speaking, "marshes" or "swamps," but which are "marsh or swamp lands," meaning thereby lands which are so situated as to be rendered difficult or incapable of

*Rehearing allowed. See opinion, 82 Neb. ———.

successful cultivation by reason of retaining in the soil or carrying on the surface an excessive quantity of water during certain portions of the year, even though at other times they. may be as solid, dry and firm as lands in general.

6. **Statutes: Construction.** In considering an amendatory or substituted statute, it is proper to consider the provisions of the law which was repealed in connection with the law which takes its place, in order to ascertain the legislative intent, and all provisions of the original statute which are not carried forward into or repeated in the new law are annulled by the repealing statute.

7. ———: ———. In order to ascertain the proper meaning of a statute later as well as earlier legislation upon the same subject may be referred to. All existing acts should be considered, and a subsequent statute may often aid in the interpretation of a prior one.

8. **Drains: Powers of County Boards.** Under the facts set forth in the opinion, *held* that the county board of Kearney county is without jurisdiction to change the channel and divert the waters of the streams mentioned in the opinion from their natural flow for the purpose of preventing overflows, nor has it the authority to take part of the plaintiff's land against his will for the purpose of draining the lands embraced within the proposed drainage district.

APPEAL from the district court for Kearney county: ED L. ADAMS, JUDGE. *Reversed. Decree for plaintiff.*

*H. M. Sinclair* and *J. L. McPheeley,* for appellant.

*L. C. Paulson* and *C. P. Anderbery, contra.*

*Robert E. Evans* and *John V. Pearson, amici curiæ.*

LETTON, J.

The plaintiff, who is the owner of a certain tract of land in Kearney county, brought this action against the defendants, Peter J. Youngson and others, as constituting the board of supervisors of Kearney county. The petition, in substance, alleges that a petition was presented to the county board of supervisors under the provisions of the drainage act passed and approved February 28, 1881, asking that a drainage ditch be constructed over and across

plaintiff's land; that the board procured the same to be surveyed, and has ordered its construction across his land, and intends to pay the cost of construction by special as-. sessment made against the lands claimed to be benefited. He alleges it will take more than four acres of his land, and will greatly injure the remainder of the tract, and that no provision has been made to compensate him. He further alleges that there are no marsh or swamp lands contiguous to the proposed ditch, but that its only purpose is to arrest the natural flow of surface water and divert the same from its natural channel and cast it upon and across his land; that the statute confers no jurisdiction upon the board to take lands for the purpose of diverting surface water and alleges a number of other reasons for the claim that the board is without jurisdiction. He asks a perpetual injunction to restrain the threatened action. The answer, in substance, pleads that the board had jurisdiction in the premises; that the land proposed to be drained is marsh or swamp land, and that the object of the ditch is to drain the same and render it fit for. agricultural purposes, to benefit the public roads, and to promote the health and general welfare of the inhabitants of the district. A trial was had, and a decree rendered dissolving the injunction and dismissing the action, and from this judgment the plaintiff appeals.

Generally, where the determination of a matter has been referred to the consideration of a particular administrative board or officer, and no appeal is provided for from such decision, its order or determination is final, and will not be subject to collateral attack. In *Andrews v. Lillian Irrigation District*, 66 Neb. 461, it was held that the question whether land will be benefited by an irrigation system and the creation of the irrigation district is exclusively for the county board, and is conclusive in a collateral proceeding. In *Dodge County v. Acom*, 61 Neb. 376, and in *Tyson v. Washington County*, 78 Neb. 211, the same principle was stated and upheld with reference to the determination of the county board that the construction and establish-

ment of a drainage ditch would be conducive to public health, convenience or welfare, and as to whether or not the route thereof is practicable. In the latter case it is said: "We think that no authority can be found holding that the policy or expediency of constructing any such public work, the exercise of discretion as to which is vested in any administrative board or official, can, in the absence of statutory permission, be interfered with or tried by the courts." Under this principle, therefore, and under the facts presented in this case, the only question necessary to determine is whether the county board possessed jurisdiction to order the proposed improvement. If it possessed the requisite authority, injunction will not lie on account of mere irregularities in the exercise of the power. The determining factor in this case with reference to this question is whether or not the lands proposed to be benefited by the improvement and to be assessed to pay the cost of the same are within and of the class, or are of the nature with reference to which power is conferred upon the county authorities to act, or, in other words, whether the board had jurisdiction of the subject matter. In order to determine this, a brief description of the locality where it is proposed to construct the ditch is necessary. "Whiskey slough" is a stream of water which flows' eastwardly through a somewhat shallow and tortuous channel about two rods wide and three or four feet deep close to the northern boundary of Kearney county. Its general course is parallel with that of the Platte river, at a distance from the south bank thereof varying from a few rods to nearly a mile, it being farthest from the river at a point near the south line of plaintiff's land. The territory through which it runs its entire course is the nearly level bottom of the river valley, which is here several miles wide and which has a nearly uniform slope or inclination to the eastward of about seven feet to the mile. The volume of water within its banks rises and falls substantially as does the water in the river, the subsoil between the two streams being of a very porous or sandy nature, so that its flow is

usually governed largely by that of the water in the larger stream. The land lying to the southward of the river valley consists of rolling hills, cut up by hollows and ravines, which form natural drainage channels and drain the surface water caused by heavy rains and melting snows toward the river, but which are intercepted at this locality by the bed of Whiskey slough. The plaintiff owns the southwest quarter of section 23 in Blaine township, and, according to the map introduced in evidence, the south line of this tract of land is crossed by Whiskey slough no fewer than seven times in its winding flow toward the east. Near the southwest quarter of this land a ravine or natural drainage channel, having its head or rise in the high ground some seven or eight miles to the southwest, intersects the channel of the slough. This natural waterway or drainage channel known as "Dry creek" drains a large expanse of territory, and in times of heavy rains carries down and discharges at the point where it enters the stream a large volume of surface water, thereby causing the slough, at such times, to overflow its banks and to inundate the almost level lands upon either side, extending from below the mouth of Dry creek to the lower course of the slough. Counsel for the defendants in his brief describes the condition which the proposed improvement is designed to remedy, as follows: "During wet seasons, and especially so during the last four or five years, heavy rains would fill up the two sloughs, Whiskey slough and Dry creek, and, where they join, the slow, sluggish, sinuous and tortuous nature of Whiskey slough fails to properly conduct the waters coming from the two sloughs to the river. By virtue of these conditions, the water would overflow the banks of Whiskey slough and onto the lands adjacent. Because of the failure of Whiskey slough to convey the additional water from Dry creek, its own banks would overflow for a great distance back of its junction with Dry creek, the water being backed up over its banks and on the surrounding country. The land on both sides of Whiskey slough, being of a level nature, the fall being

seven feet to the mile or one-fourth inch to the rod, instead of receiving much needed assistance from Whiskey slough in conducting its large amount of surplus rain water into the river, it receives added burdens from the overflow of Whiskey slough. During four consecutive seasons the crops were totally destroyed for a distance of ten or twelve miles east and west along Whiskey slough. This entire territory became a swampy, marshy tract, full of swales and low places, with Whiskey slough, instead of draining it, doing the reverse, feeding it more and more. In this condition, the ground becomes unfit for cultivation when too wet, and, if it ever dries up, again becomes unfit because of its hardened condition."

This is the situation of the lands in question as placed in the light most favorable to the defendants' contention. There is evidence on the plaintiff's side of the case, however, tending to prove that much of the trouble that has occurred in later years has been caused by the careless and unskilful manner in which a section line road has been constructed in the locality, by which the channel of Whiskey slough has been blocked and obstructed at different points so as to hinder the free flow of surface water therein and to create ponds where none existed before. One witness testifies as follows: "The condition of things is this: Sometimes there is a freshet. The Whiskey slough, if it rains, itself, would carry off its own water, but when there is a freshet most of the water comes down out of the sand hills, and that runs into Whiskey slough. They undertook to build a road, and, instead of putting crossings and bridges in where the creek crosses the road, they filled it up on the level, and when the water comes down through Whiskey slough it couldn't pass. * * * It could not have the natural course, and then they had a ditch two feet wide on one side and about a foot deep to carry the water out, and the other side of the road they scraped out there to help fill the road out. Now, as the road is, the water backs up, and if it was opened out and let the water through so that Whiskey slough

could have the natural course to carry off the water it would carry off all of the water." It will be seen that there is a decided conflict as to the actual condition of the lands in question.

The manner in which it is proposed to remedy the evils complained of is as follows: It is proposed to dig a ditch, beginning at a point in Dry Creek 120 rods south of Whiskey slough, sufficient in size and capacity to carry all of the waters of Dry creek and of the slough, and to extend this ditch northward across Whiskey slough and along the west side of plaintiff's land and other lands until it reaches another ravine draining into the Platte river. The object of this proposed construction is to change the channel and alter the course of Dry creek, and also of Whiskey slough, in such manner as to divert all of the waters of both streams from their natural channel so that, instead of discharging into the Platte river at the mouth of Whiskey slough, about nine miles from the point of diversion, they will discharge into the river at a point about one mile north of the intersection. The report of the commissioner who was appointed to view the proposed ditch is to the effect that no lands will be benefited thereby except such as lie to the eastward and at a lower level than the proposed ditch. It is apparent that the evil arises, not from the wet or swampy nature of the lands on Whiskey slough to the west of the mouth of Dry creek, as they are not benefited by the ditch, but from the sudden discharge of the waters of that creek into the channel of Whiskey slough at the point of intersection. As a matter of fact, the proposal is to create an artificial channel for and to divert thereinto the waters of the perennial stream, Whiskey slough, and the surface water at times flowing down the natural drainage channel known as "Dry creek."

Does the act contemplate or authorize the condemnation of private property for such purpose and the assessment of the cost thereof upon the land of the adjoining proprietors? It is an elementary principle that the right

to take the property of another *in invitum* must be clearly shown, and that a strict construction should be given statutes authorizing such a proceeding, such statutes being in derogation of common right. Black, Interpretation of Laws, p. 303. This doctrine is not to be unreasonably extended so as to hamper the execution of public enterprises designed for the general welfare, but, at the same time, property rights of individuals are not to be interfered with unless the power to do so is plainly conferred by the law. The act under which the authority is claimed was passed in 1881, and is entitled "An act to provide for draining marsh or swamp lands in the state of Nebraska, and to repeal an act entitled 'An act to drain marsh or swamp lands,' passed March 3, 1873, took effect June 1, 1873." Laws 1881, ch. 51. It is earnestly contended by the plaintiff that under the title of this act no authority can be conferred to drain lands other than those which are distinctively marshes or swamps and that the lands in the locality in question are not of that nature; hence that no jurisdiction is possessed by the county board to drain the same. From an examination of the testimony in this case it would appear that the lands which the commissioner reports would be benefited by the proposed ditch cannot be said to constitute a "swamp" or "marsh." We think, however, that it was not the intention of the legislature to confer power to drain "marshes" or "swamps" alone, but to drain "marsh or swamp lands," which is a term of wider significance, and which has been held by other courts to mean lands which, by reason of their wet or marshy nature, are incapable of successful cultivation. *San Francisco Sav. Union v. Irwin*, 28 Fed. 708. Land which, from its low and level character, may from excessive rainfalls retain at some seasons of the year sufficient water so that it is rendered incapable of cultivation may fall within the class of swamp lands, yet the same tract could hardly be said to form or be a "swamp." We find no difficulty therefore in holding that the power is conferred by this act to drain

lands which are not "swamps" or "marshes," but which are "swamp lands," meaning thereby lands which are so situated as to be rendered difficult or incapable of successful cultivation by reason of retaining in the soil or carrying on the surface an excessive quantity of water during certain portions of the year, even though at other times they may be as solid, dry and firm as lands in general.

The question presented is whether the statute authorizes the compulsory taking of lands against the will of the owner in order to provide for the prevention of overflows. In construing an amendatory or substituted statute, it is necessary to consider the provisions of the former law which was repealed in connection with the law which takes its place, in order to ascertain the legislative intent, and all provisions of the original statute which are not carried forward into or repeated in the new law are effectually annulled by the repealing statute. *Ex parte Crow Dog,* 109 U. S. 556, 3 Sup. Ct. Rep. 396; *Goodno v. City of Oshkosh,* 31 Wis. 127; *Viterbo v. Friedlander,* 120 U. S. 707, 7 Sup. Ct. Rep. 962, 972. Section 1 of the act of 1873 (Gen. St. 1873, ch. 80), which was repealed by the law under consideration, provides: "When a majority of the resident owners of any marsh, swamp, *watercourse,* or *overflowed.* land within this state shall wish to have a ditch or drain laid out for the purpose of draining any marsh, swamp, or *overflowed* land, or for the purpose of straightening or enlarging any watercourse, they may make application, * * * the commissioners shall proceed to lay out such ditch or drain, or to deepen, widen, or in any form enlarge any watercourse for the purpose of draining the lands embraced in such petition, if in their judgment such ditch, drain, or enlargement is demanded by, or will conduce to the public health or welfare." Section 2 provides: "Whenever application shall be made to the county commissioners of any county by a majority of the resident owners of any swamp, marsh, *overflowed* lands, or *watercourse* * * *

for the purpose of having any ditch, drain, or watercourse laid out," etc. It will be observed that this act provides for application by the owners of overflowed lands or of a watercourse, as well as owners of swamp or marsh lands, and the powers conferred upon the commissioners by the body of the act extended to the straightening or enlargement of a watercourse apparently with reference to the draining of lands contiguous to streams of surplus waters thrown upon them by overflow, as well as lands of the character of marsh or swamp lands. The act of 1881, under consideration, which repealed this act, confers power upon the county board to cause to be located, constructed, straightened, widened, altered or deepened any ditch, drain, or watercourse when the same is necessary to drain any lots, lands, public or corporate, road or railroad, and will be conducive to the public health, convenience and welfare. Under this act the petition for the improvement need only be signed by one or more owners of lots or lands which will be benefited, instead of a majority of the resident owners as the former act requires. It omits entirely any provision for the construction of a ditch or drain for the purpose of draining overflowed lands. It cannot be said that this was done by inadvertence, or that the meaning and intention of the present act is the same as that which was repealed. The former provided specifically for the drainage of overflowed lands. The present omits all reference thereto. If it is said that this act covers all lands, then the act is broader than the title; but we think the words "marsh and swamp lands" in the title must be read into and control the general words in the body of the act, and that the qualifying words in the title are as effective as if contained in the act itself.

In order to ascertain the proper meaning of a statute, we may refer to later as well as earlier legislation upon the same subject. All existing acts should be considered in considering a given act, and a subsequent statute may often aid in the interpretation of a prior one. 26 Am. &

Eng. Ency. Law (2d ed.), 624, and cases cited in note two. An examination of the later course of legislation confirms us in our view that the act of 1881 does not confer power upon county boards to divert streams and change the course of natural drainage channels in order to prevent overflow. In 1905, and before the proceedings were begun, an act was passed and took effect, entitled "An act for the organization and government of drainage districts; for the reclamation and protection of swamp, *overflowed* or *submerged* lands," etc. (laws 1905, ch. 161); and, further, in 1907 another act was passed, entitled "An act to provide for drainage districts to drain wet land, and *land subject to overflow,* and any land which will be improved by drainage; to build dikes and levies; to construct, straighten, widen, deepen, or alter any ditch, drain or stream or watercourse; * * * to construct, enlarge, extend, improve or maintain any *system of control of surface water or running water,"* etc. Laws 1907, ch. 153. It is apparent from these enactments that the legislature was of the opinion that further legislation was necessary in order to confer power upon county authorities to prevent overflows by controlling the course of natural water ways so as to prevent the discharge of surface or overflow waters upon low or level lands, or to alter or straighten any stream or watercourse, or to construct or maintain any system of control of surface water or running water, and that by these later enactments it undertook to confer powers over a subject not already embraced in existing laws.

The plaintiff argues that the title of the act of 1881 is too restricted to cover all the subjects contained therein, but, irrespective of the question whether the titles of the respective acts of 1873 and 1881 are sufficiently broad to embrace all of the powers conferred within the bodies of the respective acts, a question which has been already passed upon by this court in the case of *Dodge County v. Acom,* and *Tyson v. Washington County, supra,* we are satisfied that the power to change the channel of Dry

creek and Whiskey slough, to divert the waters of these watercourses from their natural flow, and to change their place of outlet, as proposed, is not conferred by the act under consideration, nor is the power conferred thereby to drain lands which are not of the character of swamp or marsh lands as defined in this opinion.

The action of the county board in the premises was without jurisdiction, and the plaintiff is entitled to a perpetual injunction as prayed for in his petition.

JUDGMENT ACCORDINGLY.