THURSTON COUNTY FARM BUREAU, APPELLANT, V. THURSTON COUNTY ET AL., APPELLEES.

287 N. W. 180

FILED JULY 11, 1939. No. 30706.

*Perry, Van Pelt & Marti* and *A. P. Coleman*, for appellant.

*Alfred D. Raun*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESS-MORE and JOHNSEN, JJ., and LANDIS, District Judge.

SIMMONS, C. J.

This is an action for a declaratory judgment construing section 2-1113, Comp. St. Supp. 1937. The matter was submitted upon an agreed statement of facts. The plaintiff herein is a duly organized farm bureau. The defendants are the county of Thurston, its three commissioners, and one resident taxpayer. Prior to September 1, 1938, a proper petition was filed with the county clerk of defendant county, asking for the submission to the voters of the question whether there should be county funds appropriated for the support of agricultural extension work in the defendant county beginning January 1, 1939. Pursuant to law, the county clerk placed upon the ballots for the general election of November, 1938, the following question: "Shall an appropriation be made annually from the general fund of the county for the support of agricultural extension work? Yes ☐ No ☐" There were 1,119 ballots cast against, and 1,465 cast for the proposition, a total of 2,584. The highest number of votes cast for any office or proposition was 4,003. The plaintiff, contending that a majority of all the votes cast *on the proposition* being favorable thereto, filed its estimate and asked the county board of defendant county to set aside in the annual budget the amount authorized to be appropriated for agricultural work. The defendant commissioners refused, contending that before the appropriation could be made the proposition must be carried by a majority *of all votes cast at the election,* and that the proposition failed to receive the necessary favorable votes.

Plaintiff brought this action for a declaratory judgment, to determine its rights and status, and to secure a construction of the statute on the one proposition of law.

The trial court found that "the results of the election held on November 8, 1938, do not entitle plaintiff to any appropriation of funds from the county of Thurston for the year 1939." Plaintiff appeals.

The record presents the single question of law: Does the

statute require the proposition to receive a majority of all votes cast at the election or a majority of all votes cast on the proposition, even though that majority be a minority of all votes cast?

The provision of the act to be construed is set out hereafter in this opinion. The rules of construction require this court to discover, if possible, from the language of the act, the legislative intent and give effect thereto. *Hansen v. Dakota County,* 135 Neb. 582, 283 N. W. 217. The wisdom of the act or the merits of the present proposal cannot be considered in determining the question here presented.

" 'The legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute we must consider the preexisting law and any other acts relating to the same subject.' *Nebraska District of Evangelical Lutheran Synod v. McKelvie,* 104 Neb. 93, 175 N. W. 531." *Chicago & N. W. R. Co. v. Bauman,* 132 Neb. 67, 271 N. W. 256.

" 'In considering an amendatory or substituted statute, it is proper to consider the provisions of the law which was repealed in connection with the law which takes its place, in order to ascertain the legislative intent, and all provisions of the original statute which are not carried forward into or repeated in the new law are annulled by the repealing statute.' *Campbell v. Youngson,* 80 Neb. 322, 114 N. W. 415." *Mills v. Mills,* 130 Neb. 881, 266 N. W. 759.

"In order to ascertain the intention of the legislature in the amendment of a statute, the course of legislation on the subject and existing conditions created under the former statutory provisions may be considered." *Union P. R. Co. v. Heuer,* 97 Neb. 436, 150 N. W. 259.

This legislation began with the enactment of House Roll 524 in 1913 (Laws 1913, ch. 227; Rev. St. 1913, secs. 70 to 72, inc.), providing for the employment of county farm demonstrators to aid in the development of agricultural methods. That act provided that upon a "petition, signed by at least *ten per cent.* of the farm landowners * * * the county board may set aside from the county general fund

a sum of money to employ" a county farm demonstrator. The act contained no provision for an election, and provided no way for any one to protest. The petition and the decision of the county board controlled. No limit was placed upon the amount of money that could be appropriated.

The legislature in 1919 repealed the foregoing act (Laws 1919, ch. 203; Comp. St. 1922, secs. 69 to 73, inc.), and enacted a new act providing: "Whenever in any county not less than three hundred *bona fide* residents of the county who are engaged in farming, or a smaller number, when such smaller number is not less than one-half of the *bona fide* farmers in any county, shall have organized themselves into a Farm Bureau, shall petition the county board to appropriate" money for the promotion of agriculture and the employment of a county agricultural agent, "the county board shall set aside annually" sums of money, as provided in the act. Under the conditions of the act, the county board were required to issue warrants to pay claims approved by the farm bureau. The amount that could be appropriated should not exceed an amount equal to a one-mill levy on the assessed valuation of the property of the county, and in no instance more than $5,000.

The legislature in 1923 repealed the foregoing act (Laws 1923, ch. 1) and enacted Senate File No. 9, providing that the county board *shall set aside* money for the purpose of improving agriculture and the employment of an agricultural agent upon the petition of the required number of persons. The act required the petitions to be filed not later than September 1, 1924, and every second year thereafter. The petitioners had to be persons "actually and actively engaged in farming." The number of signers required increased from 100 in counties having a population of 3,000 or less, to 600 in counties having a population of more than 17,000. The act further provided that, if within twenty days after the filing of the petition, there was a remonstrance filed against the allowance of the farm bureau budget, signed by residents actually and actively engaged in farming, numbering one-eighth more than signed the

petition, the county board should submit the question to a vote of the *people of the county* at the next *general election.* The manner of submission was set out, and section 7 provided: "If a majority of the electors voting *on the question* shall express themselves in favor of the creation of a county agricultural agent the county board shall grant the petition. If a majority of such electors shall vote against such proposition, the county board shall deny the request of the petition." The total amount that could be appropriated was reduced to $3,500. In this act, for the first time, provision is made for remonstrances, for an election, and for a decision by the people of the county.

By House Roll No. 36 (Laws 1925, ch. 2) and by Senate File No. 283 (Laws 1927, ch. 55) amendments were made to a part of the act not important to be noted here. The act as so amended became sections 2-1101 to 2-1109, inc., Comp. St. 1929.

In 1933, by Senate File No. 309 (Laws 1933, ch. 3), the last named sections were repealed, and a new act passed which is now sections 2-1110 to 2-1117, inc , Comp. St. Supp. 1937. This last act enlarged the scope of the previous acts, but all the acts had the same general purpose. By this act "a farm operator who is a legal voter" could be a petitioner. The provisions of this act with reference to the petitions. the election, etc., which is to be construed, are as follows:

"If on or before September 1 of any even numbered year, a petition is filed with the County Clerk containing the names of *twenty per cent.* (20%) or more of the 'farm operators' of any county or counties, as determined by the last available Federal Census comprising a district under this act, asking the submission *to the voters* of the question of whether there shall be county funds appropriated for the *continuance* or *support* of County Agricultural Extension Work in said county or district beginning on January 1st after the filing of said petition, it shall be the duty of the clerk of said county to have placed upon the ballot *at the election* following the filing of said petition the question, 'Shall an appropriation be made annually from the

general fund of the county for the support of Agricultural Extension Work?

Yes ☐                    No ☐

"If a majority of the votes cast are opposed to such appropriation then the county board shall deny the appropriation. If a majority of the votes cast are in favor of the appropriation then the county board shall annually set aside in the general fund of the county an amount equal to the county farm bureau budget provided such sum shall not exceed an amount equal to a one-fifth mill levy on the assessed valuation nor more than $2,000 in counties having a population of less than 10,000; $2,400 in counties having a population of less than 17,000 and more than 10,000; and $2,800 in counties having a population of 17,000 or over and, as claims are approved by the Board of Directors of the Farm Bureau and filed with the County Clerk, the county board shall order warrants to be drawn upon the general fund of the county in payment of such claims.

"It is further provided that in counties where Extension Work is being conducted in accordance with sections repealed by this Act the county board *shall continue* to appropriate funds for the *continuance* of extension work *until such support is denied by vote as provided for in this section:* Provided further that if before January 1st, 1934, there is filed with the county board, a petition containing the names of 51 per cent., or more, of the qualified voters voting for Governor at the last general election in any county where a county farm bureau exists, said petition praying that the county appropriation for extension work in such county be discontinued, it shall be the duty of the county board to discontinue the appropriation of county funds for the support of extension work in said county." (Italics ours.)

It is noted that by the last act the number of petitioners has again been changed, that remonstrance petitions are not provided for, and that elections by "the voters" are necessary.

It is also noted that the various acts clearly demonstrate a progressive intent on the part of the legislature to restrict

the appropriation of moneys for the purposes of the act unless that expenditure is approved by the voters, and to require clearer proof of that approval.

It will also be noted that by the provisions of the 1923 act the appropriation of the money could be made when "a majority of the electors voting *on the question*" were favorable. By the provisions of the 1933 act, that qualification was removed and "a majority of the votes cast" was required. The fact that each of these acts, while repealing preceding ones, actually was an amendment (see *First Trust Co. v. Smith,* 134 Neb. 84, 277 N. W. 762, second syllabus), and the similarity of the language used in section 2-1107, Comp. St. 1929, and that used in section 2-1113, Comp. St. Supp. 1937, as to the majorities required, indicate that the legislature in drafting the latter act followed the language of the former act and intentionally omitted the qualification "voting on the question," and intended thereby to increase the required majority to one of "all votes cast" at the election. Had the legislature desired to limit the required majority to those voting *on the question,* they could have done so by the simple method of not omitting the language. Such an intent is in accord with the demonstrated progressive purpose of the legislature to require approval of the voters before the expenditure of public moneys for the purposes of the act.

"Statutes are to be construed in the light of a clearly apparent legislative policy." *School District of Omaha v. Gass,* 131 Neb. 312, 267 N. W. 528.

It is also noted that the 1933 act contained a provision authorizing the discontinuance of county assistance to farm bureaus upon petition, where that assistance had been previously authorized. No such provision existed in the prior acts. The provision in section 4 is that, if before January 1, 1934, a petition is filed signed by 51 per cent. or more of the qualified voters, voting for governor in the last general election, in counties where a farm bureau exists, praying for the discontinuance of the appropriation for extension work, the county board shall discontinue the same. This

act was approved in May, 1933. The next *election* at which the question could be submitted would be in 1934. The purpose of this proviso was to enable the voters *by petition* to discontinue the appropriation a year earlier than they could *by an election.* Fifty-one per cent. or more of the qualified voters is more than a majority. The petition, of course, would deal *only* with the proposition of county aid to farm bureaus. Here is shown a specific legislative intent to require *more* than a majority of the qualified voters voting for governor in 1932 to stop the appropriation in January, 1934. It is not reasonable to assume that the legislature intended to require a majority to discontinue the appropriation in 1934, and thereafter to permit a minority of the qualified voters either to discontinue or authorize the appropriation. In this connection, it is interesting to note that the total vote cast for partisan state offices in Nebraska in 1932 was 576,946, and the total vote cast for governor in 1932 was 563,738. A majority of the total vote cast would be 288,474; 51 per cent. of the vote cast for governor would be 287,506, or 968 less than a majority of that large total. These figures were, of course, officially before the legislature when they wrote the 1933 act.

This court has long had the following rule of construction:

"When the legislature, in a statute, employs language which has elsewhere received a fairly well settled construction, it will be presumed that such construction was in the contemplation of the legislature, and expresses the true meaning. * * *

"If the words used had at the time received a settled construction, we must presume that the legislature adopted them in that sense." *Kendall v. Garneau,* 55 Neb. 403, 75 N.W. 852. See 59 C. J. 1063.

In order to determine the proper rule of construction to be applied to the language being construed herein, it is necessary to point out that in the 1923 act it was provided that where petition and remonstrance were filed, the question of the appropriation should be submitted "to a vote of the people of the county at the next *general* election." That

language was continued in the act of 1925 (Laws 1925, ch. 2), and in the 1927 act (Laws 1927, ch. 55). The act of 1933 provided that the proposition *shall* be put upon the ballot at the "election following the filing" of the petition. The words *general election* are not used. However, the act provides for the filing of the petition "on or before September 1 of any even numbered year." The election following September 1 of the even numbered years is the general election. It appears clear that the legislature so intended it. We have then a legislative requirement that this proposition shall be submitted to the voters at a *general election.* Why? It is probable that economy in the expenses of the election was a consideration for that requirement. However, there is a more fundamental reason recited in many of the cases dealing with the construction of such acts. Common experience has shown that a much larger number of voters participate in general elections than in special elections, and that when propositions are submitted to the voters at general elections a more nearly complete decision of the total number of voters can be had. It is also important to note that the act does not call for the proposition to be submitted on a separate ballot, but "upon the ballot at the election." This clearly shows an intent that all voters shall have the proposition submitted to them.

The rule is stated in 20 C. J. 207, as follows: "The authorities also diverge in their construction of the constitutional and statutory provisions where the proposition is submitted at a general election. One construction is that the proposition is carried if it receives the specified majority of the votes actually cast on the proposition." (The cases cited by the plaintiff herein are cited by the above text on that proposition.) "Another construction is that, in order to carry, the proposition must receive the required majority of the votes of the persons who participate in the election and vote for any candidate or on any proposition, regardless of whether or not they vote on the particular proposition." Among the decisions cited sustaining the latter proposition are nine decisions of this court. We have ex-

amined the cases cited by the above authority in the text and in the annotations on both propositions. There is a conflict in the cases, sometimes more apparent than real. The decisions quite often turn upon the particular language used in the provision being construed, upon the historical basis of the provisions, the time when submitted, etc.

An earlier text, 10 Am. & Eng. Ency. of Law (2d ed.) p. 754, states the rule as follows:

"When the law requires, for the election of an officer or the carrying of a measure, a vote of a majority, or a specified proportion of the legal or qualified voters, it is generally considered sufficient if the required proportion of the votes actually cast is in favor of the candidate or measure, and there is no necessity for any inquiry as to the actual number of voters in the district; for it is presumed that all legal electors voted, or, if they did not, that they acquiesced in the action of those who did. It would seem that an application of the same principle would lead to the conclusion that where a measure is submitted to the voters at a general election, or at the same time as other measures, it should be considered carried if a majority, or the required proportion, of the votes actually cast for or against such measure are in the affirmative; and there are cases supporting this view. But the great weight of authority is otherwise, and supports the view that in order to pass such a measure it must have the actual affirmative vote of a majority or the required proportion of those who participate in the election."

Here again decisions of this court are cited among those supporting the rule announced in the last sentence above quoted.

It should also be pointed out that many of the courts make a distinction between propositions which *may be* submitted at general elections and those which *are required* to be submitted at general elections, holding that the rule, that the majority vote must be a majority of all those cast at the election, applies only where the proposition must be submitted at a general election.

There is an interesting discussion of this proposition in 1 Dillon, Municipal Corporations (5th ed.) beginning on page 653. The author places the decisions of this court with decisions of other states, accepting the view that a majority of the voters means a majority of those qualified or entitled to vote, and not merely those voting upon a particular question. He reaches the conclusion that this state among others determines the number entitled to vote by the vote cast upon other questions or candidates for office at the same election. In any event, he lists the decisions of this court as requiring a majority of all the electors voting at the election in order to carry the proposition, and not a majority of those who are voting upon the particular question. This author, like the writers of the other texts, lists the cases cited by the plaintiff as holding a contrary view.

It should also be noted that some of the decisions refer to a majority vote or a majority of those voting at the election. Section 4 of the 1933 act specifically says that, if a majority of the votes cast are opposed, or are in favor of the appropriation, it shall be denied or granted. The words "at the election" are not used in that sentence. However, in the preceding sentence, section 4 requires the submission of the proposition to the voters at the election. Quite obviously, the legislature must have intended the language to read: "If a majority of the votes cast *at the election* are opposed, or are in favor of the appropriation," etc. It is perfectly obvious that the votes could not be legally cast under any other conditions than at the election. So, the words "votes cast" must be construed in connection with the words "at the election" used in the preceding sentence.

In *State v. Lancaster County,* 6 Neb. 474, 482, this court had for construction a constitutional provision authorizing township organization in counties "whenever a majority of the legal voters of such county, voting at any general election, shall so determine." The question was, did it require a majority of all votes cast at the election, or a majority of the votes cast on the proposition. This court held that the "plain meaning of the words used" required a majority

of all legal voters voting at the general election to carry the proposition, and that although the proposition of township organization received a majority of the votes cast on the proposition, nevertheless it had not received the required majority of all those voting at the election, and accordingly was defeated. This case has been repeatedly cited with approval by this court, other courts, and text-writers.

*State v. Babcock,* 17 Neb. 188, 22 N. W. 372, involved the question as to whether or not a constitutional amendment had been adopted. The proposal received a majority of the votes cast on the proposition, but failed to receive a majority of all votes cast at the election. The Constitution required that amendments be submitted "to the electors" (after certain preliminaries) at "the next election of senators and representatives * * * and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution." Obviously, an election where senators and representatives are elected is a *general election.* This court held that a majority of all votes cast in the state at the election for senators and representatives was necessary to adopt the amendment.

*State v. Bechel,* 22 Neb. 158, 34 N. W. 342, involved the sufficiency of a vote on a proposition to authorize a street railway company to construct lines on the streets of Omaha. The proposition was submitted at a general city election. It was not required that it be so submitted, but it was so done for convenience. Separate ballots and separate ballot boxes were used. Separate poll lists were not kept. The statute required "a majority of the votes cast at such election" to authorize the construction. The proposition received a majority of the votes on the proposition, but not a majority of the votes cast at the election. This court held that there was but *one* election, and that the proposition required a majority of all votes cast at that election.

*State v. Anderson,* 26 Neb. 517, 42 N. W. 421, is severely criticized by plaintiff. It involved the question of whether or not a proposal to sell county real estate had received the required vote. The statute there construed is now section

26-113, Comp. St. 1929. It required that the proposition be submitted "to a vote of the electors of the county." It provided: "If it appears that two-thirds of the votes cast are in favor of the proposition," etc. This court held that the words "two-thirds of the votes cast" meant two-thirds of the votes cast at the polls of the general election at which the question was submitted to the electors. It will be noted that, although the proposition in this case was submitted at a general election, the law did not require that it be so submitted. The only other difference in the two cases is that, in the *Anderson* case, the requirement was "two-thirds of the votes cast" while the statute we are construing requires "a majority of the votes cast." The decision in *State v. Anderson, supra,* has been cited with approval by this court in *State v. Clark,* 59 Neb. 702, 82 N. W. 8; *State v. Cornell,* 53 Neb. 556, 74 N. W. 59; *Bryan v. City of Lincoln,* 50 Neb. 620, 70 N. W. 252; *Douglas County v. Keller,* 43 Neb. 635, 62 N. W. 60; and the doctrine of *State v. Anderson, supra,* was held correct and approved and followed in *Stenberg v. State,* 50 Neb. 127, 69 N. W. 849, and has been cited by the text-writers hereinbefore quoted. Plaintiff points out that it was criticized in *Territory of Oklahoma v. Board of Trustees,* 13 Okla. 605, 76 Pac. 165. In that case, the court stated: "We have carefully examined nearly all of them (cases cited by plaintiff in error), and find no reason to differ from them in any case, unless *it might be* in the case of *State v. Anderson,* 26 Neb. 517, 42 N. W. 421, *where the language of the statute is not quoted.*" (Italics ours.) An examination of *State v. Anderson, supra,* shows that the statute is set out in full on page 520 of the official report. It appears that the writer of the Oklahoma opinion had not "carefully examined" the decision of this court. Plaintiff also points out that the supreme court of North Dakota in *State v. Langlie,* 5 N. Dak. 594, 67 N. W. 958, refused to follow *State v. Anderson, supra.* The North Dakota court cited with approval the case of *Gillespie v. Palmer,* 20 Wis. 572 (sometimes cited as page *544) and *Sanford v. Prentice,* 28 Wis. 358. It is interesting to note, however, that

*Gillespie v. Palmer, supra,* and *Sanford v. Prentice, supra,* were considered by this court in *State v. Lancaster County, supra,* and *State v. Babcock, supra,* and this court refused to follow them. *Sanford v. Prentice, supra,* was cited, and not followed, in *State v. Bechel, supra.* Plaintiff also points out that Chief Justice Cobb dissented in *State v. Babcock, supra.* Judge Cobb in his dissent in that case cited the above Wisconsin cases. It is further interesting to note that in *Sawyer v. Dodge County Mutual Ins. Co.,* 37 Wis. 503, 524, the statement is made that *Gillespie v. Palmer, supra,* had "been subjected to the criticism that the court decided it in accordance with 'the logic of the war,' rather than 'the logic of the law,'" and that the chief justice of the Wisconsin court referred to *Gillespie v. Palmer, supra,* as one of a number of cases "which have long been made a reproach to the court as judgments proceeding upon policy rather than upon principle." *Bound v. Wisconsin Central R. Co.,* 45 Wis. 543. *Gillespie v. Palmer, supra,* was rejected in *Stebbins v. Judge of Superior Court,* 108 Mich. 693, 66 N. W. 594, as not "supported by reason or authority." It is not followed in *Belknap v. City of Louisville,* 99 Ky. 474, 36 S. W. 1118. It is further interesting to note that the North Dakota case cites, along with the Wisconsin decisions, one federal case, and the cases of *Board of Commissioners v. Winkley,* 29 Kan. 36, and *State v. Echols,* 41 Kan. 1, 20 Pac. 523. The *Echols* case follows the *Winkley* case, and *Territory of Oklahoma v. Board of Trustees, supra,* followed the *Echols* case, and the *Winkley* case in turn cited *Gillespie v. Palmer, supra,* as one of the five cases relied upon.

The federal case cited in the North Dakota case is *Armour Bros. Banking Co. v. Board of County Commissioners,* 41 Fed. 321. The court in that decision cited the two Kansas cases and the two Wisconsin cases herein referred to, and stated that the decision of this court in *State v. Lancaster County, supra,* was "in conflict, to some extent," with the cases it had previously cited. The only other case cited in 41 Fed. 321 on this proposition is *County of Cass v. Johnston,* 5 Otto (U. S.) 360. This court referred to

the *Cass County* case in *State v. Roper,* 47 Neb. 417, 66 N. W. 539, as "of little practical value in this state." It was cited and not followed in *State v. Bechel, supra.* Further, with reference to *State v. Langlie, supra,* and *State v. Grace,* 20 Or. 154, 25 Pac. 382, also cited by plaintiff, the supreme court of Mississippi in *State v. Powell,* 77 Miss. 543, 27 So. 927, referred to these as cases "of very little value" and pointed out that they both quote *Gillespie v. Palmer, supra,* "a case thoroughly repudiated by many courts and of no authority."

In commenting upon the decision in *State v. Anderson, supra,* plaintiff quotes the following part of a sentence from the opinion of Judge Cobb with reference to *State v. Babcock, supra*: "It is hardly worth while to remark that the writer did not at the time concur in that opinion." The remainder of the sentence is not quoted by the plaintiff, and is as follows: "But it followed in principle an earlier decision of the court, and probably *is supported by the weight of authority,* and may be regarded as expressing the *settled doctrine in this state.*" (Italics ours.)

It is now interesting to review the decision written by Chief Justice Cobb in *State v. Benton,* 29 Neb. 460, 45 N. W. 794. In that case, the statute required the proposition of the issuance of bonds to be submitted "at an election called for that purpose, or at any regular election * * * to the qualified voters * * * and if a majority of the ballots polled at such an election" shall favor the bonds they might be issued. The proposition was submitted at the city election, and did not receive a majority of the total ballots polled in the city election, although it received a majority of the votes cast on the proposition. Judge Cobb cited *State v. Lancaster County, supra, State v. Bechel, supra,* and *State v. Babcock, supra,* and, with reference to the last case, said: "The writer concurred in that opinion, not that he assented to its conclusions as an original proposition, but because it had become the *settled rule of construction* of the court, and *was, therefore, no longer to be disputed.*" The holding was that the issuance of the bonds had not been sanctioned by

the required number of votes. It is again noted that *Gillespie v. Palmer, supra,* was cited to the court in *State v. Benton, supra,* and not followed.

We need not pay further attention to the criticism of *State v. Anderson, supra,* in the cases cited by the plaintiff.

In *State v. Van Camp,* 36 Neb. 91, 54 N. W. 113, this court construed a statute which required "a majority of the legal voters of Holt county to give their assent" to a boundary change "at the next general election" before certain territory could be added to that county. The proposition did not receive a majority of the votes cast in the county, and this court held that it was defeated.

*State v. Roper,* 46 Neb. 724, 61 N. W. 753, involved a special election for the relocation of a county seat. The statute provided: "Any place receiving three-fifths *of all the votes cast* shall become and remain * * * the county seat of said county." This court said: "The meaning of the law is that a county seat of a county shall not be relocated at any place unless three-fifths of all the electors of the county shall express their will to that effect by their votes at an election held for that purpose; and the law presumes that when such an election is held that all the electors of the county vote at such election." Upon a rehearing (47 Neb. 417, 66 N. W. 539) the question considered was whether or not certain ballots should be counted as votes cast. However, in arriving at that proposition, this court reviewed *State v. Lancaster County, supra,* and then said: "It is unnecessary to consider other authorities cited in the aforesaid opinion in this case, for they clearly support the same general principle, and that is, that when a proposition of the nature of that under consideration is submitted at a *general* election, the *highest* number of votes cast *on any proposition* or for any candidate is assumed to be the total number of which the requisite majority must be obtained." Later in the same opinion, this court said: "Where there occurs at the same time a general and a special election, there is given an exact basis from which to ascertain the number of electors, and that is the greatest number of votes cast for any candidate or proposition."

In *Bryan v. City of Lincoln,* 50 Neb. 620, 70 N. W. 252, the question was presented as to whether or not a bond issue had received the required favorable vote. The statute provided that the bonds could be issued "when the same shall have been authorized by a vote of the people." The proposition was submitted at the general city election and the same officers, registration lists, polling places, and voting booths were used for the general election and the election on the bonds. Separate ballot boxes were used "and probably separate poll lists." This court held that the word "people" meant electors or voters and that there was but one election when considered for the purpose of determining how many persons participated as voters. This court reviewed a large number of the decisions of this court, and stated on page 630: "We have thus referred to the foregoing decisions of this court for the purpose of calling attention to the fact that through and in each and every one of them there is the element or principle that if a proposition is submitted at a *general state or municipal election,* under a law which requires for the adoption of the proposition a *majority of all the votes cast,* it must receive more than one-half of the total number of votes polled at such election on any matter or the filling of any office on which a vote is taken." The court held that the statute required a majority of all the votes cast at the election to approve the issuance of the bonds.

Because of the importance of and public interest in the question, we have thus reviewed a large number of the decisions of this court. The rule announced in these decisions is too firmly established to be further questioned in this state. To the student of the problem we cite the additional cases of *Douglas County v. Keller,* 43 Neb. 635, 62 N. W. 60; *Tecumseh Nat. Bank v. Saunders,* 51 Neb. 801, 71 N. W. 779; *State v. Clark,* 59 Neb. 702, 82 N. W. 8.

We will now consider in paragraphs numbered 1 to 6 the cases upon which plaintiff relied in its brief and at the bar of this court.

(1) *Walker v. Oswald,* 68 Md. 146, 11 Atl. 711. Here the

language of the statute with reference to the return of the election results was considerably stressed as showing the intention of the act. It relied upon the case of *County of Cass v. Johnston, supra,* which was cited and not followed in *State v. Bechel, supra,* and which this court refused to follow in *State v. Roper, supra. Walker v. Oswald, supra,* was cited to this court and not followed in *State v. Benton, supra.* In many other jurisdictions it is referred to and not followed.

(2) *Cashman v. City Clerk,* 213 Mass. 153, 100 N. E. 58, was decided in keeping with "an unvarying policy of the legislature to make the acceptance of a city charter turn upon the affirmative votes of a majority of those voting on the question." In the footnotes it cites as "in consonance" *County of Cass v. Johnston, supra; Gillespie v. Palmer, supra; Walker v. Oswald, supra;* which decisions this court has refused to follow.

(3) *City of South Bend v. Lewis,* 138 Ind. 512, 37 N. E. 986, requires more attention. First, it should be pointed out that in that case the law authorizing the submission of the proposition of city consolidation did not require that it be submitted at a general election, but it was so submitted. The act provided in detail for a return of the election results not involved in the statute we are now construing. The court on the general proposition of what majority was required cited, among other cases, *Gillespie v. Palmer, supra,* and *County of Cass v. Johnston, supra.* The court then said that in every case the decision rested upon the construction of the statute under which the election was held. The court also said: "It is equally well settled that where a question is required to be submitted at a general election, and a 'majority of the voters' at 'such election' is required to adopt the measure, a majority of *those voting at the election* is required, and not merely a majority of those voting *on the proposition."* The court cited, among other cases, *State v. Lancaster County, supra.*

The court then stated:

"It appears from an examination of these cases, that

when an act of the legislative body provides that the votes of a majority of the voters of any subordinate corporation shall be requisite to the adoption of any measure, then the only question is, did the measure receive a majority of the votes of the electors voting on the proposed measure; but when the act requires that the question shall be voted on at some general election and receive a majority of the votes cast at such election, *then it must be voted for by a majority of all the electors taking part in such general election.*

"In the case under consideration there was no requirement that the question of annexation should be submitted at a general election, but it was left to the officers of the city and town to determine when the election shall be held. The forms of ballots to be used are prescribed and provision made for casting and counting the votes cast on the question of annexation alone. No votes, except those upon the subject, are mentioned or contemplated in the act, and the only election named is the one which is to be agreed upon between the city and town authorities."

The court then discussed the statute and reached the conclusion that the legislature contemplated no other election than the one on the proposition and pointed out the distinction between the Indiana statute and that under consideration in *State v. Babcock, supra.* The court then asked the question as to whether the fact that the proposition, while not required to be so submitted, was submitted at a general election would change the result and have the effect of counting against the proposition those who voted at the general election but who failed to vote on the proposition. The court there discussed a number of cases, which, as we have heretofore pointed out, have not been followed by this court. The court then said:

"From what we have said, we think it clearly appears that four leading principles may be considered as fully established, namely: First. Where a measure is proposed to the people, and its adoption is made to depend on a vote of the majority, those who do not vote are considered as

acquiescing in the result declared by those who do vote, even though these voting constitute a minority of those entitled to vote. Second. *Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at 'such election,' a majority of all the votes cast at the election is meant, and not merely a majority of the votes cast on that particular question.* Third. Where, at a general election, a proposition is submitted to the voters, the result of the vote on the proposition will be determined by the votes cast for and against it, in the absence of a provision in the law, under which it is submitted, to the contrary. Fourth. Where a legislative body provides that a proposition shall be submitted to the voters, that those in favor of the proposition shall cast an affirmative vote, and that those electors opposed to the proposition shall cast a negative vote, and that a 'majority of the votes given' shall be requisite to the adoption of the proposed measure, then the only votes to be counted and considered in determining whether the measure is adopted or not are those which are given on the particular question involved. Of the correctness of these four principles we think there can be no dispute. The only doubts which can arise are those occasioned by a confusion of the second and third."

The court held that under the facts of the *South Bend* case, applying the principles announced, it required only a majority of those voting on the proposition to give it the required vote.

Plaintiff cites the "Fourth" rule in its brief. Clearly, the "Second" rule applies to the statute which we are now construing. The decision in *City of South Bend v. Lewis, supra,* sustains the position of the defendants in the instant case.

(4)   *In re Todd,* 208 Ind. 168, 193 N. E. 865. This case involved the question of the majority necessary for the adoption of a constitutional amendment. The court reviewed the decision of Judge Dailey in *City of South Bend v. Lewis, supra,* and quoted that part which we have quoted herein;

next recited the language which they were construing and stated on page 193:

"The foregoing does not require a proposed amendment to be submitted to the electors at a general election. Consequently Judge Dailey's second principle does not govern. We find a perfect example for the application of the second principle in paragraph 15 of the Schedule of the Constitution (*supra*, p. 184) which authorizes the submission of a proposal to 'the voters of said county, at a general election' and further provides that 'a majority of all the votes given at said election' shall be required to carry the proposal. Another example is found in art. VIII of the Constitution of 1816. This article authorized the General Assembly to submit a proposal for a constitutional convention to the 'electors' of the state at a general election, and, for the approval of such proposal, specifically required a 'majority of all the votes given at such election.' * * * In short, the effect of omitting any reference to a general election is to treat a submission of a proposed amendment as a separate and distinct election, even though the submission be on the day of a general election and even though the machinery at the general election be used to poll, canvass and return the votes cast in the election on the amendment."

The court further stated: "And since there is an absence of any language which requires a majority of all 'persons possessed of the legal qualifications entitling them to vote' or a majority of all votes cast at a general election we believe the submission clause falls within the first and third propositions of Judge Dailey."

(5) *Territory of Oklahoma v. Board of Trustees*, 13 Okla. 605, 76 Pac. 165. We have already discussed this case. Only one added comment is needed. There the statute did not require, but permitted, submission of the proposition at a regular election, and it was so submitted. There the statute provided: "The votes on said question shall be canvassed, * * * and if a majority of all the votes cast shall be in favor of," etc. The court clearly placed its decision upon the provision of "votes *on said question*."

(6) In its reply brief, plaintiff quotes from *Stebbins v. Judge of Superior Court*, 108 Mich. 693, 66 N. W. 594. That case involved a bond issue. The city charter provided that bonds could not be issued unless the qualified electors authorized it "by a majority of their votes cast at any regular election, or at a special election called for the purpose of voting upon such question." The proposition was placed on a general election ballot. The vote on the proposition was favorable, but it did not receive a majority of all votes cast. Hence, the same question arose that has been discussed in the other cases. Those who contended that a majority on the proposition was sufficient cited, among other cases, as supporting their contention, *Gillespie v. Palmer, supra,* and *Walker v. Oswald, supra.* The court in one paragraph reviewed the cases so cited. For some undisclosed reason, plaintiff herein dips into the middle of that paragraph and quotes a part of the discussion, stopping just before the court's reference to *Walker v. Oswald, supra.* Plaintiff does not point out that in the next paragraph the court say: "We must hold that the above authorities" (among others, those quoted by the plaintiff herein) "*are not controlling,* and must look elsewhere for authority and reason on which to base our conclusion. * * * To say that the legislature meant that a majority of those voting at the general election on the proposition should control would be to place in the statute words and an intent not found in it. We see nothing absurd, however, in the legislature providing that at a special election a majority of the votes * * * cast at the election should control." The court looked "elsewhere," found, and cited, among other cases, *State v. Babcock, supra,* and held that a majority of all the votes cast at the general elections was required.

Section 2-1113, Comp. St. Supp. 1937, is the only act which was before the trial court and which is before this court for construction. This proceeding was started in the district court March 4, 1939; decree was rendered April 1, 1939; the transcript filed in this court April 24, 1939; and oral argument made June 7, 1939. By act of the legislature,

with an emergency clause, approved June 8, 1939, the provisions of sections 2-1110 to 2-1117, inclusive, Comp. St. Supp. 1937, were repealed and legislative bill No. 212 enacted. The construction of the 1939 act is not before us in this proceeding. However, "In order to ascertain the proper meaning of a statute, we may refer to later as well as earlier legislation upon the same subject, * * * and a subsequent statute may often aid in the interpretation of a prior one." *Campbell v. Youngson,* 80 Neb. 322, 114 N. W. 415. The act of 1939 amends the 1933 act in several particulars. Three changes are important to be considered here. First, section 4 (2-1113, *supra*) is amended to provide that, "If a majority of the votes cast *on this question* are opposed to such appropriation, then the county board shall deny the appropriation. If a majority of the votes cast *on this question* are in favor of the appropriation, then the county board shall" etc. The two insertions of the words "on this question" are the material changes here. It is suggested that the legislature attempted thereby to clarify the provision of the 1933 act. However, the second change in the section was to strike out that part of the 1933 act, hereinbefore discussed, which provided for the discontinuance of an appropriation on January 1, 1934, upon the petition of 51 per cent. of the qualified voters. While the provision so stricken was not operative unless the petition was filed before January 1, 1934, yet the power to discontinue appropriation by that method could have been extended by the legislature by a change of the date. The legislature did not extend that power. Had the legislature merely repealed that provision, it might have been argued that the purpose was to discontinue an inoperative provision rather than to change the policy of the 1933 act. However, the third change is the addition in the place of the omitted provision of a sentence, not in the 1933 act, authorizing an appropriation *for one year,* in counties not receiving an appropriation, upon a certain showing made before August 1 of any odd numbered year, and providing for the submission "of the question of continued support at the general election as

provided when a twenty per cent. petition is filed in an even numbered year." Here the use of the words "general election" confirms the interpretation which we have put upon the 1933 act. The omission of any provision authorizing a discontinuance and the enactment in its place of a provision authorizing an appropriation, without an election, is a distinct reversal of policy. The title of the 1933 act recited that it was an act "* * * to authorize county boards to appropriate, under certain conditions, funds, * * *" the comparable language in the title of the 1939 act is "* * * to provide procedure for creating or abolishing the appropriation of county funds. * * *" These changes of the 1933 act show, not an effort to clarify the act on the proposition here presented, but an effort to change materially the provisions of the 1933 act, and is a change in legislative policy and not a clarification. The 1939 act does not alter but affirms the construction placed herein upon the 1933 act.

There remains one further proposition to be considered. Plaintiff contends that, if the statute is construed as we construe it, then we must reject as meaningless or superfluous the sentence in section 4, "If a majority of the votes cast are opposed to such appropriation then the county board shall deny the appropriation;" that to hold there was not a majority of votes cast as opposed and to hold there was not a majority of votes cast in favor of the proposition would be an absurd result; and that, upon no theory, can it be claimed that a majority of the votes cast were opposed to the appropriation. This contention fades out in the light of an analysis of the statute. In the act of 1923, the legislature recognized that there were counties where farm bureau maintenance was being allowed under the previous law, and it was provided that, in those counties, the county board should continue to appropriate funds to maintain the county agent until January 1, 1925. Between the date of enactment and January 1, 1925, the question of continuing aid to those counties could be determined under the provisions of the new act of 1923. The same situation was recognized in the act of 1933, and it was provided that in

counties where extension work was being conducted the county board should continue to appropriate funds "for the *continuance* of extension work until such support is denied by vote as provided for in this section" (Section 4). It is clear that the legislature intended in the 1933 act that in counties where extension work was receiving county appropriations the question submitted would be the "continuance" thereof, and that in counties where no aid had been granted and was asked for the question would be on the granting of "support."

The language in the first sentence of section 4 provides for "the submission to the voters of the question of whether there shall be county funds appropriated for the continuance *or* support of county agricultural extension work." The use of the alternative "or" is noted.

Two questions can be submitted. First: Shall aid be continued? Second: Shall the farm bureau be supported? The question to be submitted depends upon the status of county aid in the county when the act was passed. The same language is to be used in submitting either proposition. It is next provided: "If a majority of the votes cast are opposed to such appropriation" then it shall be denied "as provided for in this section." So interpreted, the language just quoted is in entire harmony with the provision, hereinbefore discussed, providing for the discontinuance of the appropriation upon the petition of 51 per cent. of the voters. If the question of "support," where aid has not been previously granted, is submitted, then a majority of the votes cast must be in favor of the appropriation. The language of the sentence, "If a majority of the votes are opposed to such appropriation, then the appropriation shall be denied," indicates an appropriation already being made which shall be discontinued. The language of the sentence, "If a majority of the votes cast are in favor of the appropriation then the county board shall annually set aside in the general fund of the county," etc., indicates that an appropriation shall be made where none was being made theretofore. So construed, the language of the act is in entire harmony, and no provision need be disregarded.

Neither the pleadings nor the agreed facts recite, in so many words, that county aid was not previously being granted in Thurston county. There does not appear to be a question as to that however. The positive statement is made in defendants' brief that the plaintiff was not receiving aid from the defendant county; the statement of facts recites that the petition asked "funds for the support of agricultural work" and that the defendant taxpayer will "suffer substantial damage if such appropriation" is made. His answer recites that if the appropriation is granted his taxes "will be materially increased." Hence, we conclude that the proposition submitted to the voters of Thurston county was that of granting support in the future and that such support was not being given.

Plaintiff in the oral argument before this court conceded the correctness of the three following propositions of law submitted by the defendants:

(1) "A county or any of its subdivisions has no inherent right to make an appropriation for special purposes."

(2) "The effect of making an appropriation by a county for agricultural purposes is to create a lien upon all property in the county for the payment of said appropriation and the right to make an appropriation is derived entirely from the statute, the terms of which must be substantially complied with."

(3) "The provisions of statute regulating the procedure for the authorization of an appropriation should be strictly construed, and, if any doubt arises it should be resolved in the interest of the taxpayer and the appropriation should be denied."

In order to authorize the appropriation of funds, for the purpose expressed in the act under consideration, for the support of county agricultural work in counties where appropriations for that support were not being made when the 1933 act was passed, it is necessary that the proposition receive a majority of all votes cast at the election at which the proposition is submitted.

"There is in the entire range of judicial investigation no

principle more firmly established or resting upon sounder reasons than the rule requiring public bodies like counties, when acting under a special power, to act strictly within the conditions prescribed for the exercise of such power." *Douglas County v. Keller, supra.*

The action of the defendant board of county commissioners was proper in refusing to set aside, in the general fund of the county, funds for the support of agricultural extension work, and in refusing to make the appropriation.

The judgment of the trial court is

AFFIRMED.